**20TH CENTURY WEAR, INC.,**
**Appellee-Cross-Appellant,**

**v.**

**SANMARK–STARDUST INC. and Domino Industries, Inc.,**
**Appellants-Cross-Appellees.**

**Nos. 1328, 1389, Dockets**
**84–7108, 84–7112.**

United States Court of Appeals,
Second Circuit.

Argued June 8, 1984.

Decided Oct. 18, 1984.

---

Howard C. Miskin, New York City (Howard F. Mandelbaum, Colvin, Miskin, Basseches & Mandelbaum, New York City, of counsel), for appellants-cross-appellees.

Stephen M. Rathkopf, New York City (Rodney A. Brown, Leonard Benowich, Golenbock & Barell, New York City, of counsel), for appellee-cross-appellant.

Before OAKES, NEWMAN and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This appeal involves a registered trademark—"Cozy Warm ENERGY–SAVERS" —in connection with the sale of flannel pajamas and nightgowns. The United States District Court for the Southern District of New York, Robert L. Carter, *Judge*, found "Cozy Warm ENERGY–SAVERS" to be a "suggestive" term entitled to trademark protection; and it subsequently found defendant liable for trademark infringement under section 32(1) of the Lanham Trade-Mark Act, 15 U.S.C. § 1114(1) (1982). In addition, the court noted that the infringer's practices also violated state unfair competition law. The judgment awarded a permanent injunction and $252,982.52 in damages (including $81,718.67 paid in commissions by the infringer to its selling agent), plus prejudgment interest at 9% from October 9, 1981, and $25,000 in attorneys' fees. We reverse and remand for further findings with respect to the protection of the trademark and to defendant's liability under New York state unfair competition law.

## Background

In the shadow of the energy crisis of 1973, the OPEC oil price increases, and the resultant impairment of the United States economy and individual standards of living, the United States government, aided by private industries, editorial opinion and numerous other sources, made a tremendous effort to impress the importance of energy saving and conservation on the American public. This campaign took many forms, from the publication of Department of Energy "tips" [1] to Department of Agriculture Energy Management Checklists.[2] There was a National Energy Plan,[3] a Federal Energy Administration—later the Depart-

---

1. U.S. Dep't of Energy, Tips for Energy Savers (1979).

2. U.S. Dep't of Agriculture, Energy Management Checklist for the Home (1975).

3. National Energy Conservation Policy Act, Pub.L. No. 95–619, 92 Stat. 3206 (1978) (codified at scattered sections of 42 U.S.C.); Energy Policy and Conservation Act, Pub.L. No. 94–163, 89 Stat. 871 (1975) (codified at 42 U.S.C. §§ 6201–6422 (1982)).

ment of Energy [4]—and an enormous effort at all levels of government to promote energy efficiency. Examples of the public and private interest in energy efficiency include the federal imposition of the 55-mile per hour speed limit, the introduction of smaller and lighter automobiles, and public acceptance of hundreds of other new or neglected products and measures designed to conserve electricity, home heating oil, gas, and all other forms of energy—housing insulation, heating insulation, window shades, lamp adaptors and dimmers, storm windows and doors, shower heads, caulking strips, wood stoves, fewer window openings to the north, greater use of solar energy, to mention just a few examples.

Not surprisingly, this national movement was partially focused on the use in winter of warm clothing to permit the lowering of temperatures in homes, office buildings, factories, government buildings, and so on—as perhaps epitomized by the President's appearing on national television in his cardigan sweater. Clothing makers, as well as purveyors of household items such as sheets, blankets, comforters, blanket throws and drapes, took to advertising their products as "saving energy," "energy saving," and the like. Department stores and clothing stores did likewise in reference to, among other things, sweaters, underwear, robes, gowns, nightshirts, children's sleepers, boots and so-called body warmers or wraparounds, which doubled as comforters. For example, the "Bundle-Up" was advertised as an "all purpose energy saver . . . to keep warm," providing "superior insulation . . . and cozy warmth." The consumer was urged to "turn your thermostat down, conserve energy and still be comfortable." Numerous examples of such advertising were offered in evidence but not received by the district court. Any peruser of mail order catalogues has seen numerous advertisements like these for roughly the last ten years.

THE FACTS IN THIS CASE

20th Century Wear, Inc. (20th Century), is a New York corporation in the wholesale business of importing and selling women's pajamas and nightgowns to retailers, mail order and discount houses and other merchandisers. Sanmark-Stardust, Inc. (Sanmark), is a New York corporation—incidentally situated in the building next to 20th Century's—that deals in many other forms of clothing in addition to women's pajamas and nightgowns.

20th Century markets its pajamas in the customary form of a transparent plastic bag containing the garment and various tags. Sewn onto the collar of the garment is a tag bearing the name "20th Century" in blue, and below that the phrases "guaranteed washable" in red and "100% cotton" in blue. Three hang tags accompany the product. One of them includes a picture of a woman with her hands on her hips modeling the packaged garment, a printed description of the garment, and the slogan "for the style of your life" printed in red. The second tag contains the cotton producers' well-known "Cotton Boll" logo, the phrases "A Natural Fiber" and "As Seen on the Today Show," and the 20th Century name. The third insert has a red background and white border with bold print "Cozy Warm ENERGY–SAVERS" in white with the trademark notice. The writing appears diagonally across the rectangular tag. A bold line appears under the last two letters of "ENERGY" and the first five letters of "SAVERS."

The United States Patent & Trademark Office accepted the mark "Cozy Warm ENERGY–SAVERS" for registration on March 17, 1981, for use with pajamas, nightgowns, dusters (three-quarter length cotton robes), and loungewear. It required, however, that 20th Century disclaim exclusive use of the words "cozy" and "warm" apart from the mark as registered. *See* Registration No. 1,148,448 (Int'l Class 25, 37 C.F.R. § 6.1(25) (1984)) ("No claim is made to exclusive use of 'cozy' and 'warm' apart from the mark as shown.").

Beginning in July, 1981, and continuing until October 19, 1981, Sanmark sold wom-

4. *See* 42 U.S.C. § 7151 (1982).

en's pajamas and nightgowns under the "Sheila Anne" label and used a tag bearing the words "Cozy Warm CONSERVES–ENERGY" in connection therewith. Like many other pajama wholesalers, Sanmark's products are also packaged in transparent cellophane wrapping. The collar tag lists the name "Sheila Anne" in blue print lettering, and underneath, in smaller lettering, "pre-shrunk," "guaranteed machine washable," and "100% cotton," with the size indicated in red. The Sanmark transparent plastic bag also contains three hang tags. One describes the garment and depicts a woman with her hands on her hips modeling the garment.[5] The second insert, in white and blue, contains the cotton producers' logo and the phrase "Made of A Natural Fiber." The third insert has a white border and blue background with the phrase "Cozy Warm" in red under which, in white, is the phrase "CONSERVES–ENERGY" underscored with a red line. The writing appears diagonally across the rectangular tag in type that is virtually the same size, style, and format as the type used by 20th Century. Even the hyphen, which is grammatically unnecessary, simulates the distinctive type style of the hyphen in 20th Century's mark. A bold line, similar to that used by 20th Century, appears under the last three letters of "CONSERVES" and the first four letters of "ENERGY."

The district court held Sanmark liable for trademark infringement. The court began by noting that the opposing parties sell to many of the same customers, generally shops, stores, and clothing chains, and that 20th Century's sales fell off when Sanmark began selling its Sheila Anne pajamas and nightgowns. Turning to trademark law, the court stated that the registered trademark "does not bring women's pajamas and nightgowns to mind, and requires 'imaginative [sic] thought and perception,' Stix Products, Inc. v. United Merchants & Manufacturers, Inc. [295 F.Supp. 479, 488

(S.D.N.Y.1968)], to relate the mark to women's sleepwear." Accordingly, purporting to follow Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 (2d Cir.1976), the district court held that the mark was suggestive, not descriptive, and entitled to protection without regard to whether the mark had acquired a secondary meaning.

The court also concluded that there was a likelihood of confusion between Sanmark's trade dress and mark and those used by 20th Century. The court, by visual examination of the packaged products, found that an appreciable number of ordinary, prudent purchasers were likely to be confused or misled into believing that Sanmark's garments were 20th Century's. According to the court, Sanmark's "Cozy Warm CONSERVES–ENERGY" is confusingly similar to 20th Century's registered trademark, and "the imitative trade dress compounds the confusion." But while the court found a violation under section 32(1) of the Lanham Trade-Mark Act, 15 U.S.C. § 1114(1), it did not find a federal false designation of origin violation under section 43(a) of the Act, 15 U.S.C. § 1125(a). In the court's view, a claim of false designation of origin could not stand, because Sanmark had clearly marked its products as a Sheila Anne design. The court then stated that "while it is clear that" Sanmark and its selling agent, Domino Industries, "are guilty of unfair competition under New York law, … since [20th Century was given] complete relief under federal statutes, the violation of New York law adds nothing to [20th Century's] entitlement to recovery."

## DISCUSSION

### 1. Trademark Infringement

Section 32(1)(a) of the Lanham TradeMark Act, 15 U.S.C. § 1114(1)(a), provides a federal cause of action for trademark in

---

**5.** While the pictures on the tags accompanying the pajamas of both companies had a woman with both hands on hips, the pictures accompanying the nightgowns differed—the 20th Century nightgown tag pictured a woman with one hand on one hip, while the Sanmark nightgown tag pictured a woman with both hands on hips.

fringement when a "colorable imitation of a registered mark ... is likely to cause confusion." Success depends on "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). This court has repeatedly held that a finding of infringement turns on an assessment of several factors including the strength of the senior user's mark, the similarity of the marks, the similarity of the products and the trade dress, actual confusion, the junior user's good faith, and the sophistication of the buyers. *See, e.g., Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1129 (2d Cir.1982); *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 89 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see also Toys 'R' Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1195 (E.D.N.Y.1983). In this case, we address the strength of the mark "Cozy Warm ENERGY–SAVERS," and remand for further findings on whether the mark has acquired secondary meaning.

As Judge Friendly's opinion in *Abercrombie & Fitch*, 537 F.2d at 9, points out, there are four different levels of trademark protection: (1) generic (not entitled to protection even with proof of secondary meaning),[6] (2) descriptive (entitled to protection with proof of secondary meaning), (3) suggestive (entitled to protection without proof of secondary meaning), and (4) arbitrary or fanciful (enjoying "the rights accorded to suggestive terms as marks— without the need of debating whether the term is 'merely descriptive,'" *id.* at 11).

The difficulty, of course, lies in determining what level of protection a particular mark deserves. This determination in turn depends upon the particular context of the mark's use, the context of its time of use, and the context of its group of users. *See Abercrombie & Fitch*, 537 F.2d at 9; *see also McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). Making such a determination—pigeonholing or labeling—has always been a slippery business, as Cardozo reminded us so many times. *See, e.g., Henneford v. Silas Mason Co.*, 300 U.S. 577, 586, 57 S.Ct. 524, 528, 81 L.Ed. 814 (1937); *Techt v. Hughes*, 229 N.Y. 222, 246, 128 N.E. 185, 193 (1920); Cardozo, *Mr. Justice Holmes*, 44 Harv.L. Rev. 682, 689 (1931), *reprinted in Selected Writings of Benjamin N. Cardozo* 83 (1947).

This case involves the distinction between suggestive and descriptive terms, a distinction, Judge Friendly noted, "that the courts have had great difficulty in defining." *Abercrombie & Fitch*, 537 F.2d at 10. A useful standard, however, can be stated:

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968), *quoted in Abercrombie & Fitch*, 573 F.2d at 11.

We hold that "Cozy Warm ENERGY–SAVERS" is a descriptive term. The district court mischaracterized the mark because it failed to consider how the meaning of the words "Cozy Warm ENERGY–SAVERS" had changed over time. The court

---

**6.** Callmann's treatise argues that there should be no distinction on the basis of secondary meaning between generic and descriptive marks: "The courts should ... go back to singly evaluating the argument for secondary meaning on its merits in each case." 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 18.03, at 10 (L. Altman 4th ed. 1983). The earlier position of the courts re-

ferred to is illustrated by *Kellogg v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) (finding a term generic but still assessing its secondary meaning). *See also* Folsom & Teply, *Trademarked Generic Words*, 89 Yale L.J. 1323 (1980) (arguing that the substantive law concerning generic marks should be reformulated to account for economic aspects).

assumed that a step of the imagination is needed to connect the concept of energy saving to women's pajamas and concluded that the mark is "suggestive" rather than "descriptive." And it may be true that such a step would have been needed, say, in 1973 or 1975. But by 1981, the connection between "Cozy Warm ENERGY–SAVERS" and the warming quality of plaintiff's pajama no longer required imagination, since many people were using this kind of language to describe clothing.

■ As one of the leading commentators reminds us, a term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product. Under the first branch, "if qualities, ingredients, effects or other features of the product are indicated naturally and in ordinary language, so that the consumer understands its significance without any exercise of the imagination, the words are descriptive." 3 R. Callmann, *supra* note 6, § 18.05, at 17. Under the second brand, Callmann distinguishes among three subcategories of marks that describe the product's purpose or utility: (1) marks describing the problem or condition that the trademarked product is designed to remedy or otherwise deal with; (2) marks that describe the use to which the product or service is put; and (3) marks that describe the effect that the product or service is supposed to produce after it is used. *Id.* at 27. He notes that courts generally hold that marks in the first two subcategories are descriptive, but that some courts have improperly tended to hold that marks in the third subcategory are not descriptive of goods or services. *Id.* at 17, 27–29.

Had this suit been brought before the energy crisis, we might well have concluded that the mark was suggestive. But by the time of the alleged infringement, "Cozy Warm ENERGY–SAVERS" fell on the descriptive rather than the suggestive side of a shifting line and as such was not entitled to protection absent proof of secondary meaning. "Cozy Warm ENERGY–SAVERS" defies Callmann's subcategorization. It does describe the quality of warming that wearing the flannel pajamas or nightwear involves, and hence the effect of such wearing, since the use of flannel pajamas presumably permits one to turn down the heat somewhat lower at night. It also describes the problem or condition—energy waste—with which the product deals, however indirectly. Numerous clothing businesses and hundreds, if not thousands, of other businesses as a result of the energy crisis began using "energy saving" and "cozy warm" to describe or extol the virtues of their products. In the wake of this common usage, the public was so well educated to the concept of something "cozy warm" as an "energy saver" that consumers did not have to engage in any sort of multistage reasoning process to link the term to the virtues of any number of products, including but not limited to flannel pajamas and nightgowns. *See id.* § 18.09, at 55 ("[c]onsumer reaction to the mark, at the time in question, is the test"); Restatement (Second) of Torts § 721, at 85 (Tent. Draft No. 8 1963) ("The test [for descriptiveness] is the meaning attached to the designation by prospective purchasers . . . .").[7]

■ This usage is seen more readily perhaps by noting that the class of products for which 20th Century was given a registered mark[8] included dusters and

7. The official version of the Restatement (Second) of Torts does not include the draft provisions concerning trademark law because "the law of Unfair Competition and Trade Regulation is no more dependent upon tort law than it is on many other general fields of law and upon broad statutory developments, particularly at the federal level." Restatement (Second) of Torts, Introductory Note to Division Nine (1979).

8. Under section 33(a) of the Lanham Trade-Mark Act, 20th Century's registration of its mark is "prima facie evidence of [20th Century's] exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(a). But section 33(a) also provides that a defendant in an infringement action may prove "any legal or equitable defense or defect which might have been asserted if such mark had not been registered." A party can also challenge exclusivity by way of petition for cancellation under sec-

loungewear, not merely pajamas and night-gowns. Any clothing made for warmth—bathrobes, gowns, "body warmers" or the like—thus falls within the scope of the registered trademark. As we have said, makers of all kinds of warm clothing had sought to capitalize on the connection in the public's mind between wearing warm clothing and saving energy. Comforters, blankets, sheets, bathrobes and numerous other products associated with the human way of sleeping are and have been advertised as energy saving because they are "warm," "cozy," "snuggy," "trapping body heat," "thermal," "snuggle soft" and "snuggle warm," "warm as a bunny hug from top to toe," "toasty to your toes." Three advertisements illustrate our point.

### THALHIMERS

The Fashion Stores

announces the opening of the 60° SHOP

Step into Thalhimers' new 60° Shop, our warm answer to this coming winter's chilly problem. With everyone planning to turn back their thermostats, we are opening a shop in our Intimate Apparel Departments filled with our warmest and coziest fashions. Our hearth-side warmers include robes, body-warming, hooded nightshirts, lace-trimmed granny gowns, snuggly pajamas, body-warming thermal underwear, camisoles and pant liners. Visit our new shop and pick up a Temperature Conversion Chart and a copy of Tips on Conserving Energy provided by our state and federal goverments. Sketched below are only a few of the fashions to be found in our 60° Shop. Friendly, Four Seasons and High Point Westchester Mall.

Lingerie Ad-Clip Rev. (no specific citation in defendants' book of exhibits).

### HARZFELD'S

ENERGY CONSERVERS, our warm flannel nightshirts. Cottons in cozy, brushed flannels that insulate you against chills in the cooler dorms and rooms ahead .... Kansas City Times, Sept. 8, 1977.

### BBB BRANUELS

CONSERVE ENERGY at 65°

When the thermostat is turned down to 65°, these comfy robes, pajamas and gowns will chase the chills away in the cold of the night. Come into our Junior Department and find many "hot" fashions today! Omaha World Herald, Dec. 4, 1977.

 This analysis is also supported by the rationale for distinguishing between suggestive and descriptive terms and the purpose behind the protection of trademarks. Trademarks identify the source of a product and hence protect the source's good will. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918); *Field Enterprises Educational Corp. v. Cove Industries*, 297 F.Supp. 989, 994 (E.D.N.Y. 1969); 3 R. Callmann, *supra* note 6, § 18.-03, at 7. Descriptive terms deserve less protection than suggestive terms both because descriptive terms normally do not distinguish among similar products and because such terms "should not be monopolized by a single use." *Id.* The common usage of "cozy warm" and "energy savers" suggests that the terms cannot be

tion 14 of the Lanham Act, 15 U.S.C. § 1064, "either in a separate and independent action or as a counterclaim in an infringement suit." *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 (1st Cir.1980). Sanmark has not petitioned for cancellation. In an infringement action, the defendant has the burden of rebutting the presumption of plaintiff's right to exclusive use of a registered mark by a preponderance of the evidence. *Dan Robbins & Assoc., Inc. v. Questor Corp.*, 599 F.2d 1009, 1013–14 (C.C.P.A.1979). Sanmark has met this burden by a showing that the mark is descriptive, not suggestive.

There remains a question whether section 33(a) also creates a rebuttable presumption that a descriptive mark that has been registered has secondary meaning. *See Developments in the Law—Trade-Marks and Unfair Competition*, 68 Harv.L.Rev. 814, 828 (1955). We hold, however, that in the absence of evidence that the Patent and Trademark Office registered the mark because of its secondary meaning, 15 U.S.C. § 1052(f), registration does not shift the burden of proving a lack of secondary meaning onto the defendant.

used to distinguish 20th Century's clothing. In addition, exclusive use of the term might unfairly "monopolize" common speech.

All the foregoing assumes, of course, that the phrase "Cozy Warm ENERGY–SAVERS" in connection with women's flannel pajamas has not acquired secondary meaning. As noted above, the mark still deserves protection if plaintiffs can show "that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). The record shows that 20th Century entered proof of secondary meaning at trial. Thus, appellant argues that even if we hold that the mark is descriptive we should find that the mark deserves protection because it has acquired secondary meaning. We remand, however, for an assessment of the evidence of secondary meaning by the district court. We note first that "proof of secondary meaning entails vigorous evidentiary requirements," *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 134 (S.D.N.Y.1972), and that 20th Century has the burden of showing that the term had acquired secondary meaning in the summer of 1981 when Sanmark first began using its phrase on hang tags, *see Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980); *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 608 (S.D. N.Y.1979).[9] In assessing whether 20th Century has satisfied this heavy burden, there are many forms of evidence that help show secondary meaning, including how long the mark has been used, *see Saratoga*

*Vichy Spring Co. v. Lehman*, 491 F.Supp. 141, 150 (N.D.N.Y.1979), *aff'd*, 625 F.2d 1037 (2d Cir.1980), whether consumer studies, *see Grotrian, Helfferich, Shultz, TH. Steinweg Nachf. v. Steinway and Sons*, 523 F.2d 1331, 1340–41 (2d Cir.1975), or successful advertising, *see McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d at 1132, 1133 n. 4, show that the purchasing public associated the phrase with 20th Century's goods;[10] or even whether Sanmark intentionally copied the term, *see Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.*, 221 F.2d 464, 467 (2d Cir.), *cert. denied*, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955); 3 R. Callmann, *supra* note 6, § 19.27, at 93. *See also RJR Foods v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979).

In sum, "Cozy Warm ENERGY–SAVERS" does not deserve the protection accorded to suggestive marks. Nevertheless, if the district court finds that the term has acquired secondary meaning, the court can, of course, go on to find likelihood of confusion as to source, and thus trademark infringement.

## B. *Trade Dress; Federal and State Law*

At common law, of course, trademark or tradename infringement was only one form of tort encompassed under the concept of unfair competition, *see American Steel Foundries v. Robertson*, 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317 (1926), a concept that also included "passing off one's goods as those of another" and imitation of the trade dress of another.[11]

9. Proof of a product's popularity should not be equated with proof of secondary meaning. *See Saratoga Vichy*, 491 F.Supp. at 151.

10. We do not interpret the district court's findings with respect to the issue of likelihood of confusion as to source as including an implicit finding of secondary meaning. While confusion as to source is the fundamental inquiry in any infringement action, the elements that plaintiff must prove in a suit involving a suggestive term differ from those in a suit over a descriptive term. Proof of confusion as to source can be divided into two more specific

showings: whether the public is unlikely to distinguish the source of the allegedly infringing product from that of the infringed product and whether the public makes the connection between the trademark and the plaintiff-source. The connection between mark and source is assumed in the case of a suggestive or arbitrary term. Secondary meaning performs the role of establishing that connection here, in the case of a descriptive term.

11. The Restatement of Torts referred to these combined doctrines as the tort of "confusion of

Under the common law one who marketed goods, the physical appearance of which was a copy or imitation of the physical appearance of the goods; labels, wrappers, containers, styles or designs of another, appropriated the other's "trade dress" at least where the copied or imitated features had acquired generally in the market a special significance or secondary meaning identifying the other's goods; there was a likelihood of confusion among prospective purchasers; and the imitated features were not "functional." Restatement of Torts §§ 741, 742 (1938); *Wirtz v. Eagle Bottling Co.*, 50 N.J.Eq. 164, 166, 24 A. 658, 659 (1892). It will be recalled that the district court in this case found that Sanmark's trade dress (consisting of the various colored tags) was "imitative" and "compound[ed]" the confusion caused by imitation of the registered mark. It also found that 20th Century's "distinctive" packaging was known to Sanmark before Sanmark's use and that Sanmark's trade dress "mirror[ed]" 20th Century's. Thus, the district court found that Sanmark "adopted its mark and trade dress for no other reason than to obtain a free ride on the good reputation of its successful competitor." *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134 (2d Cir.1982). These findings were based on two preliminary findings—first, that "a cursory visual examination of the packaged product, with their tags and inserts intact, makes clear that even a prudent purchaser would have difficulty in distinguishing the source of the two products"; and, second, that because these were competitors selling identical products in the same market, the court could infer Sanmark's actual knowl-

edge of the trademark and "distinctive packaging prior to its use of the mark." Were this all there was to the case, affirmance on the basis that Sanmark was engaged in the tort of unfair competition would be possible. This is true even though the court linked the trademark and the trade dress phases of the case and we are reversing the former, especially since the district court found not only that the mass merchandising marketing environment in which these products were sold made distinctiveness in trade dress crucial, but that 20th Century and Sanmark were selling similar products to the same customers. Unfortunately, neither the facts nor the law are so clear as to permit such a disposition of the case.

As to the facts, we have the finding that Sanmark's "Sheila Anne" tag in "bold blue letters," affixed to the collar of the garment meant that Sanmark had clearly marked its product as a "Sheila Anne" design. Thus, even though "an impression has been created which makes it difficult for a prudent consumer to distinguish the two products," the court held that there was no false representation of origin warranting application of section 43 of the Lanham Trade-Mark Act, 15 U.S.C. § 1125.

Yet, section 43(a) is not limited in scope to providing protection only against verbal misrepresentations or deceptions.[12] Instead, section 43(a) has been broadly construed to provide protection against deceptive marking, packaging, and advertising of goods and services in commerce. *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir.1980).[13]

source." Restatement of Torts §§ 711–56 (1938).

12. *See, e.g., Warner Bros. v. Gay Toys, Inc.*, 724 F.2d 327, 329 (2d Cir.1983) (imitative use of Confederate flag and number on toy car actionable under § 43(a); *Harlequin Enter. v. Gulf & Western Corp.*, 644 F.2d 946, 948 (2d Cir.1981) (imitative book cover actionable under § 43(a)).

13. The underlying purpose of § 43(a) is to protect both consumers and competitors from a wide variety of misrepresentations of products and service, implicating "a broad spectrum of

marks, symbols, design elements and characters." *Warner Bros. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981); *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F.Supp. 619, 623 (S.D.N.Y. 1981). Intuitively, it would be arbitrary and adverse to the purpose underlying § 43(a) to foreclose federal protection against a false designation of origin simply because the misrepresentation is effected through confusingly imitative product packaging. As one commentator has said, "[t]he common element in all violations of § 43(a) is that goods or services have been deceptively represented to the consumer."

To maintain an action under section 43(a) for trade dress infringement, a plaintiff must allege that a competitor's product design or packaging is likely to confuse consumers as to the product source—such a design or packaging falsely designates its origin. *See Warner Bros. v. Gay Toys, Inc.*, 724 F.2d 327, 329 (2d Cir.1983); *Keebler Co.*, 624 F.2d at 378. The district court's decision that there was no false representation of origin warranting application of section 43(a) is thus inconsistent with its finding "that an appreciable number of 'ordinarily prudent purchasers' [citation omitted] are likely to be confused or misled into believing that defendant's garments are plaintiff's." Either the packaging was such as to confuse customers as to its source or it was not.

 Were section 43(a) the only law on which 20th Century's claim of trade dress infringement rested, a resolution of the paradox just discussed would be unnecessary, because so far as we can see 20th Century abandoned in this court any claim under section 43(a).[14] But the paradox persists because the district court did not reach the question of how the resolution of 20th Century's trade dress infringement claims would fare based upon New York law.[15] This trade dress issue, like the trademark infringement issue, must therefore be remanded to the district court, where at least three preliminary issues must be addressed prior to its resolution under New York law. First, the court must determine whether, under New York law, a finding of secondary meaning is essential to successful maintenance of an action for trade dress infringement.[16] Second, should the district court find that proof of secondary meaning is required under New York law for protection against trade dress infringement, the court must then determine the legal relevance of its finding that Sanmark consciously intended to copy 20th Century's trademark and trade dress—in effect, the court must decide whether and to what extent Sanmark's conscious intent to confuse is probative of 20th Century's claim that its trade dress had acquired secondary meaning. Last, al-

---

Note, *The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act,* 82 Colum.L.Rev. 77, 79 (1982).

**14.** Not only does its brief make no effort to defend the judgment that section 43(a) was violated but at two places the brief explicitly distinguishes section 43(a) and emphasizes that only section 32(1) is "applicable" to the appeal. *See Kletschka v. Driver,* 411 F.2d 436, 446–47 (2d Cir.1969). We will assume that 20th Century could have sought to defend its judgment on the basis of section 43(a) without the necessity of a cross-appeal, *see United States v. American Ry. Express Co.,* 265 U.S. 425, 435–36, 44 S.Ct. 560, 563–64, 68 L.Ed. 1087 (1924), though a cross-appeal would be required to whatever extent appellee might have wished to pursue additional relief under section 43(a) than it secured in the judgment.

**15.** *Sears Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), held that a state may not, through its law banning unfair competition, undermine federal patent rights by prohibiting the copying of an article that is protected by neither a federal patent nor a federal copyright. We held, however, in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat*

*Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979), that the monopoly rationale of *Sears-Compco* does not apply in a trademark infringement action, where the plaintiff does not assert exclusive rights to the sale of a product but merely to a mark indicating its origin or sponsorship. And in *Keebler Co.,* 624 F.2d at 372–73, Judge Coffin's opinion for the court held that the protection afforded by section 43(a) is "cumulative of, and does not preempt, the broader consumer-oriented remedies provided by the common law of unfair competition"; thus section 43(a) created a new federal statutory tort and made pre-Lanham Act decisions based on the federal common law of unfair competition persuasive, even if not controlling. On this basis we see no reason for the district court not to apply the New York state law of unfair competition.

**16.** It appears that it may not be. *See Avon Periodicals, Inc. v. Ziff-Davis Pub. Co.,* 282 A.D. 200, 201, 122 N.Y.S.2d 92, 93 (1953), aff'g 27 Misc.2d 160, 113 N.Y.S.2d 737 (Sup.Ct.1952); *see also Pharmaceuticals, Inc. v. United Whelan Corp.,* 22 Misc.2d 532, 534, 197 N.Y.S.2d 22, 25 (Sup.Ct.1959) (proper test to determine whether New York unfair competition law violated is whether public likely to be confused by trade dress features taken as a whole). *But cf. International Latex Corp. v. Flexees, Inc.,* 281 A.D. 363, 366, 119 N.Y.S.2d 409, 412 (1953) (nonunique packaging not protected from imitation).

though most courts have found, under both section 43(a) and New York unfair competition law, that only proof of a likelihood of confusion is required to obtain injunctive relief for unfair competition, some courts have held that proof of actual confusion is required to obtain a damages remedy. *See, e.g., Warner Bros. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981); *Skil Corp. v. Rockwell International Corp.,* 375 F.Supp. 777, 783 (N.D.Ill.1974). The district court found, on a "cursory visual examination," that "even a prudent purchaser would have difficulty in distinguishing the source of the two products." If the court finds that proof of actual confusion is required under New York law for 20th Century to obtain a disgorgement of Sanmark's profits, the court will then have to determine whether or not actual confusion occurred.[17]

Judgment reversed and remanded for further proceedings in accordance with this opinion.

---

**17.** Sanmark has argued at length that the use of a tape recording to refresh the witness Seymour Sunshine's recollection, even though the recording was made without Sunshine's knowledge or consent, was erroneous. The argument is that 20th Century's attorney violated legal ethics when he surreptitiously recorded a conversation with Sunshine. *Model Code of Professional Responsibility* DR1–102(A)(4), 7–102(A)(7), (8) (1981); *Model Rules of Professional Conduct* Rule 8.4(a), (c) (1983); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 337 (1974). However, the use of unethically obtained evidence merely to refresh recollection is not prohibited by the Federal Rules of Evidence.

Permitting the use of unethically obtained evidence to refresh recollection not only avoids miring the court in side issues, *cf.* 8 Wigmore § 2183 (McNaughton rev. 1961), but also furthers one of the trial's primary purposes, to uncover the truth: the canons of ethics do not determine what will jog a witness's memory. Even evidence obtained in violation of a defendant's *Miranda* rights has been used to refresh recollection. *United States v. Baratta,* 397 F.2d 215, 221–22 (2d Cir.), *cert. denied,* 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968). The court must ensure, however, that the witness actually has a present recollection and that otherwise inadmissible evidence does not slip in inadvertently for its truth. The courts and Congress have devised two safeguards for this purpose. *See* J. Weinstein & M. Berger, 3 *Weinstein's Evidence* 612–12 to –13 (1982). First, the trial judge has broad discretion to organize or limit the use of evidence to refresh recollection. *United States v. Baratta, supra,* at 222; J. Weinstein & M. Berger, *supra;* 3 J. Wigmore, *Evidence* § 765 (Chadbourn rev. 1970). Second, Rule 612 of the Federal Rules of Evidence gives opposing counsel the right to inspect at trial whatever is used to refresh recollection, to cross-examine the witness on it, and to introduce relevant portions into evidence.

On retrial, the district judge in this case should be careful to separate what the witness remembered from what was played on the tape. Reliance on the tape recording without having the witness repeat in his own words what he remembered, although the witness repeatedly disclaimed remembering details of the earlier conversation, is not proper. Even when a witness appears hostile and evasive, the witness's bare assertions that he "suppose[d]" the tape refreshed his recollection, or that he "may have said" something on the tape, do not suffice to bring in all of the recorded excerpts for their truth.

While the apparent misuse of the tape to substitute for the witness's own recollection may not amount to reversible error, because it does not affect any party's "substantial right," *see* Fed.R.Evid. 103(a); *De Laval Turbine, Inc. v. West India Industries, Inc.,* 502 F.2d 259, 263–64 (3d Cir.1974), the district court should permit opposing counsel to examine the parts of the tape not used to refresh the witness's memory. While Rule 612 only requires that the documents actually used to refresh recollection and relevant to the witness's testimony be turned over to the adverse party, *see United States v. Wright,* 489 F.2d 1181, 1189 (D.C.Cir.1973), and the rule of completeness codified in Rule 106 only applies when the writing or recorded statement is "introduced" into evidence, we think that in fairness and under the spirit of the Rules the better practice is to permit opposing counsel to examine a tape where it has been unethically obtained.

In addition, both 20th Century and Sanmark argue that the district court erred in its assessment of attorney's fees under 15 U.S.C. § 1117. But because we remand for further proceeding concerning liability, it is premature to review these attorney's fees issues.