SCHOLASTIC, INC., Plaintiff,

v.

MACMILLAN, INC. and Macmillan Book Clubs, Inc., Defendants.

No. 86 Civ. 4007 (JEL).

United States District Court, S.D. New York.

Jan. 5, 1987.

Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for plaintiff; James M. Rhodes, Jr., Jeffrey Steen, of counsel.

Robin, Blecker & Daley, Jan Constantine, Macmillan, Inc., New York City, for defendants; Albert Robin, Howard B. Barnaby, of counsel.

## OPINION

LUMBARD, Circuit Judge: *

Plaintiff Scholastic, Inc., initiated this action against defendants Macmillan, Inc., and Macmillan Book Clubs, Inc., alleging trademark infringement under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), unfair competition, and illegal dilution under Section 368–d of the New York General Business Law. Scholastic seeks principally to enjoin defendant Macmillan, Inc.'s use of the name "Creative Classroom" for its magazine, on the ground that such use conflicts with Scholastic's rights to the name "Classroom." Macmillan counterclaims, seeking cancellation of Scholastic's registration of "Classroom." Both parties waived their rights to a jury trial.

The parties raise a variety of claims relating to the validity of Scholastic's trademark on "Classroom" and the nature, if any, of Macmillan's infringement. Two questions, however, are central to the Court's determination of this case: (1) whether the term "classroom" is merely descriptive and thus available for use by other than the trademark holder; and (2) whether Scholastic made sufficient use of the name "Classroom" to create and maintain its trademark rights.

### I.

Plaintiff Scholastic and defendant Macmillan are both, among other things, publishers of magazines for teachers. This suit concerns their dispute over the right to publish a magazine in the United States bearing a title which includes the word "Classroom." The facts, as they emerged over the course of two days of testimony, were largely undisputed. The testimony primarily recounted Scholastic and Macmillan's respective efforts to develop new magazines to be sold to teachers. Because these endeavors occurred largely independently of and simultaneously to one another, each will be set forth separately.

1. *Scholastic, Inc.*—Scholastic, Inc., ("Scholastic USA") is a New York corporation which includes the wholly owned subsi-

* Sitting by designation.

diaries of Scholastic-TAB Publications, Ltd., ("Scholastic Canada") and Ashton Scholastic Pty. Ltd. ("Scholastic Australia"). In 1981, Scholastic Australia began publishing a magazine in Australia called "Classroom." The magazine was marketed exclusively to teachers and included a substantial number of "hands on" products for students—that is, assignments which teachers could photocopy and distribute to their classes. In the spring of 1983, Sharon Brain, an editor for Scholastic Canada, met with Lione Sweeney, the editor of the Australian "Classroom," to discuss the possibility of launching a similar magazine in Canada.

Brain obtained approval for the new magazine from her superiors in Canada and the United States and the charter issue of "Classroom: The Scholastic Magazine for Canadian Teachers" was published and dated May-June 1984. The magazine, which circulates to about 10,000 of the 100,000 teachers in Canada, is geared exclusively to the Canadian market. Neither the American parent nor the Canadian subsidiary have made any efforts to obtain American subscribers to "Classroom;" distribution of the magazine in the United States has been limited to a small number of prospective advertisers.

In addition to publishing magazines, Scholastic USA also operates book clubs, including one for teachers called the See Saw Book Club. The regular circular of the See Saw Book Club, which was distributed from February 28, 1985 until March 27, 1985, included a small advertisement for a special American edition of "Classroom." Scholastic Canada had prepared this special edition geared to the American market as a special, one-time offer to the 5,000 See Saw members. The promotion was not successful, however, as only 243 copies were ordered by American teachers from April 10 until June 1, 1985. To date, this has been Scholastic USA's only effort to publish a magazine named "Classroom" in the United States.

Just as Scholastic USA was beginning its test of an American version of "Class-room"—in February or March of 1985—the company learned of Macmillan's plans to launch a "hands on" magazine for teachers called "Creative Classroom." Scholastic promptly filed an application on March 13, 1985 in the United States Patent and Trademark Office to register "Classroom" as a trademark. The application claimed first use of the trademark in 1981—with the publication of the Australian "Classroom" —and first use in commerce between Canada and the United States on July 10, 1984 —with the first distribution of Canadian "Classroom" to prospective American advertisers. Meanwhile, on May 22, 1985, Scholastic USA's attorneys requested Macmillan to refrain from using the word "Classroom" as the title of its new magazine for teachers. Macmillan's attorneys promptly acknowledged receipt of the Scholastic letter and rejected its request. On September 10, 1985, Scholastic USA received Registration No. 1,359,195 of the mark "Classroom" for an "educationally oriented magazine, periodically published and addressed to teachers."

Thus, from late 1985 to the present, Scholastic USA has had a trademark but no magazine. Following the failed promotion to members of the See Saw Book Club, Scholastic USA went back to the drawing board for a "hands on" magazine for teachers. In October 1985, Scholastic USA's chief executive, Richard Robinson, assigned a staff member, Mary Dalheim, to offer a new proposal for a magazine for primary school teachers. He also assigned a Scholastic executive, Shirrel Rhoades, to supervise the project. Dalheim submitted a formal proposal to Robinson on February 18, 1986. Even though Scholastic USA had registered a trademark for the name "Classroom," only one of Dalheim's six suggested titles for the new magazine included the word "Classroom." Scholastic's plans have not progressed since the Dalheim memorandum. Its only actions have been another protest letter to Macmillan, on April 4, 1986, about the use of the name "Classroom" and, following Macmillan's rejection of that protest, the filing of this lawsuit, on May 20, 1986.

*2. Macmillan, Inc.*—Macmillan, Inc, a Delaware corporation headquartered in New York, is engaged in a wide variety of publishing enterprises. Macmillan Book Clubs, Inc., is a wholly owned subsidiary of Macmillan, Inc., whose products include book clubs, subscription programs and continuity programs. Continuity programs, like many book clubs, circulate monthly bulletins to their members which allow them the option to accept or reject a program-wide "selection" of the month. One of Macmillan's continuity programs consisted of "hands on" materials which teachers could give to their students.

Peter Quant, executive Vice President and Chief Operating Officer of Macmillan Book Clubs, testified that he first considered publication of a "hands on" magazine for teachers in late 1982 or early 1983. Knowing that Macmillan already had several other teacher publications with approximately 350,000 subscribers, Quant thought he could draw on these names and the material in the "hands on" continuity program to support the proposed magazine.

In November 1983, two of Quant's assistants, Elizabeth Cater and Ivor Kaklins, attended an industry convention where they met Sharon Brain, the editor of Scholastic Canada's "Classroom" magazine. The Macmillan people were exploring the feasibility of marketing a variety of its education products in Canada, and Brain was seeking advertising for "Classroom," which was then still in the planning stage. Brain sent Kaklins a subscription to "Classroom" when it began appearing in mid–1984.

Quant formally proposed his idea for a new magazine in a memorandum dated January 26, 1984. After receiving the go-ahead from his superiors, he began working primarily with Nancy Hall on editorial content and Kaklins on business planning for the new, as-yet-unnamed magazine. Hall took charge of the search for a title, discussing the matter with her staff in April and May of 1984. After a "brainstorming session" with her staff—which did not include Quant, Cater or Kaklins—Hall proposed to Quant and Cater, on May

11, 1986, a list of fourteen titles for the magazine. Quant consulted with Cater and Hall and then selected "Creative Classroom," because, he testified, it conveyed that the magazine was for teachers and the words had a pleasant, alliterative ring. Quant testified that at the time he selected the name he had never heard of the Australian or Canadian "Classroom" magazines; Cater and Kaklins testified that they had neither mentioned these magazines to Quant or Hall nor participated in the deliberations over a name.

After Quant selected the name, he asked Macmillan's legal department in June 1984 to perform the standard search for rights to the name "Creative Classroom." The search revealed several registrations of trademarks for unrelated publications which included the words "classroom" in the title, but no conflicts on the use of "Creative Classroom." (Scholastic did not apply for its trademark on "Classroom" until March 1985.) Quant's staff thus proceeded with their plans for "Creative Classroom," with a planned launch date in the summer of 1985.

In January 1985 Quant first learned from Elizabeth Cater of the existence of Scholastic Canada's "Classroom." Trusting his lawyers' search, believing the markets for the two magazines to be distinct, and viewing the name "Classroom" as "descriptive," Quant chose not to change the name of "Creative Classroom." Macmillan Book Clubs made a formal announcement of the new magazine in early 1985 and sent a media kit—including a prototype issue of "Creative Classroom"—to prospective advertisers, Scholastic among them, in late February or early March of 1985. As noted above, it was on March 13—apparently after receiving one of the media kits—that Scholastic applied to register the name "Classroom." On May 22, Scholastic asked Macmillan not to use the name "Classroom." Macmillan declined the request on June 13.

Macmillan then proceeded with its plans for the September 1985 launch of "Creative Classroom" with a subscription mailing to

120,000 teachers in July 1985; 20,000 of the solicitations included an eight-page sample of the new magazine. The mailing was a substantial success, generating 20,000 subscriptions. However, around the time of the test-mailing, Macmillan decided to delay the debut of "Creative Classroom" for one year, until the expiration of a noncompete agreement unrelated to this case. This decision was announced in a June 1985 industry newsletter which reached Scholastic's Robinson. Robinson testified that he thought the delay might mean that Macmillan had permanently abandoned the new magazine; thus, he did not ask his attorneys to continue their efforts to stop Macmillan from using the name "Creative Classroom."

The delay did not mean the abandonment of Macmillan's plans for "Creative Classroom," however, and the company mounted a $500,000 direct mail campaign to 1,000,000 prospective subscribers in March 1986 and also solicited advertisers at that time. The renewed activity prompted another protest letter from Scholastic's attorneys on April 4, 1986—which was met by another rejection from Macmillan's attorneys on April 30. On April 28, Macmillan sought to register a trademark for the name "Creative Classroom," but the application was denied because of Scholastic's trademark on "Classroom."

Scholastic USA brought the instant action on May 20, 1986. The first issue of "Creative Classroom" was published in August 1986, with 170,000 copies mailed to 135,000 existing and 35,000 prospective subscribers.

## II.

Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides a federal cause of action for trademark infringement when a "colorable imitation of a registered mark ... is likely to cause confusion." Success depends on "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *20th*

*Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 87 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985), quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

Our inquiry must begin by deciding into which of the four categories of trademark protection Scholastic's registration of "Classroom" falls: (1) generic (not entitled to protection even with proof of secondary meaning); (2) descriptive (entitled to protection with proof of secondary meaning); (3) suggestive (entitled to protection without proof of secondary meaning); (4) arbitrary or fanciful (enjoying "the rights accorded to suggestive terms as marks—without the need of debating whether the term is 'merely descriptive.'") *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9, 11 (2d Cir.1976).

In "determining whether the title of a periodical is a valid trademark, the same tests must be met as in the case of goods." *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 14 (2d Cir.1975) (finding magazine entitled "Consumer Electronics Monthly" to be descriptive). This determination, in turn, depends upon the particular context of the mark's use, its time of use and its group of users. *20th Century Wear, supra,* 747 F.2d at 87; *Abercrombie & Fitch, supra,* 537 F.2d at 9. The chief difficulty in categorizing magazines comes about, Judge Friendly wrote, because "unlike most goods, whose appearance will convey their nature, periodicals must depend principally on their titles to convey their character. Courts have been reluctant to find a magazine title generic, perhaps in part because the magazines in such cases were not literally the class the title designated but were *about* that class." *CES Publishing, supra,* 531 F.2d at 14 (emphasis in original). Indeed, virtually all the reported trademark cases about magazine titles are concerned with determining whether the mark is generic or descriptive. *See, e.g., H. Marvin Ginn Corp. v. International Ass'n of Fire Chiefs*, 782 F.2d

987 (Fed.Cir.1986) ("Fire Chief" is descriptive); *Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136 (7th Cir. 1984) ("Software News" is generic); *Reese Publishing Co. v. Hampton International Communications*, 620 F.2d 7 (2d Cir.1980) ("Video Buyer's Guide" is generic); *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d 4 ("Safariland Newsletter" is generic); *American Ass'n for the Advancement of Science v. Hearst Corp.*, 498 F.Supp. 244 (D.D.C.1980) ("Science" is descriptive).

Here, however, the difficulty of discerning between generic and descriptive need not detain us, because Scholastic urges that "Classroom" is *suggestive*, rather than generic *or* descriptive. That contention is plainly without merit. The traditional articulation of the distinction between suggestive and descriptive is as follows:

A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968), *quoted in Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 212–213 (2d Cir.1985); *20th Century Wear, surpa*, 747 F.2d at 87 & *Abercrombie & Fitch, supra*, 573 F.2d at 11.

The Court finds that "Classroom" is no more than a descriptive trademark. The word immediately conveys that the magazine is concerned with matters relating to teachers and students. The word "classroom" is such that a magazine bearing that name could not logically cover any subject but school instruction. Indeed, Scholastic's own promotional material referred to the general category of "classroom magazines." [1] A leading commentator has stated that a mark is descriptive if "qualities, ingredients, effects or other features of the product are indicated naturally and in ordinary language, so that the consumer understands its significance without any exercise of the imagination." 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 18.05, at 17 (4th ed. 1983). A consumer of ordinary intelligence would immediately and inevitably conclude that a magazine called "Classroom" dealt with the instruction of students.[2]

The finding that a trademark is descriptive does not, of course, conclude our inquiry. We must now inquire whether Scholastic has met the "heavy burden," *20th Century Wear, supra*, 747 F.2d at 90, of showing that "Classroom" has acquired a secondary meaning—that is, proving that consumers associated the word "classroom" with Scholastic's "Classroom" magazine when Macmillan began using the "Creative Classroom" name. *See, e.g., Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949 (2d Cir. 1981). The evidence presented at trial revealed clearly that Scholastic's "Classroom" trademark has not acquired a secondary meaning. The full extent of Scholastic's use of its trademark in the United States has been: (1) the mailing of a handful of copies of the Canadian "Classroom" to prospective American advertisers; (2) the placing of a 2–inch by 3–inch advertisement in a 16–page See Saw Book Club circular for a one-time American edition of "Classroom;" (3) the distribution of 243

1. Because several witnesses, all publishing industry employees, referred to "Classroom" and "Creative Classroom" as "teachers' magazines"—and not "classroom magazines"—Scholastic contends that "classroom" is not a descriptive term. This argument misses the point. The categories of trademark protection differentiate among the ways consumers—not producers—perceive products. Publishing industry shorthand is irrelevant to the question whether "classroom" is descriptive or suggestive. What matters is that a consumer of ordinary intelligence would have no difficulty imagining the contents of a magazine called "Classroom."

2. Furthermore, it is worth noting that in three existing registrations of magazine names which include the word "classroom"—"The Classroom Answer," "Newspaper-in-the-Classroom," and "The Whole Classroom"—the exclusive right to "classroom" had been specifically disclaimed.

copies of the American "Classroom" ordered by See Saw Book Club customers. When we consider the factors relevant to the secondary meaning inquiry, including how long the mark has been used and whether consumer studies or successful advertising indicate that the public associates the word with Scholastic, *20th Century Wear, supra,* 747 F.2d at 90, our result is clear. Scholastic's minimal use of the word "classroom" reveals that there is no likelihood, in a potential American market of one million teachers, that consumers would associate the "Classroom" trademark with Scholastic—or confuse Macmillan's "Creative Classroom" with Scholastic's "Classroom." Also relevant is whether Macmillan intentionally copied the name from Scholastic. *See Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.,* 221 F.2d 464, 467 (2d Cir.), *cert. denied,* 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955). Because the evidence indicated that the only Macmillan employees who knew of Scholastic Canada's "Classroom" magazine were not involved in the selection of the "Creative Classroom" name, that factor also does not support a finding of infringement.[3]

■ So, too, does Macmillan's good faith mitigate against a finding of infringement. First, the Macmillan employees who coined the name "Creative Classroom" had never heard of Scholastic's "Classroom." Second, once Macmillan had selected the name in May 1984, it promptly asked its attorneys to investigate whether there were any conflicting claims on the name the company had chosen. Third, the Macmillan attorneys conducted this task diligently and found no conflict regarding the name; Scholastic did not apply for registration of "Classroom" until *after* it learned of Macmillan's plans.[4] In short, Macmillan's actions were reasonable under the circumstances and do not incline the Court to enjoin its use of the word "classroom" in the title of its periodical.[5]

### III.

There is an alternative, independent ground for the Court's holding of no infringement—that Scholastic has made insufficient use of its "Classroom" trademark to assert its rights against Macmillan. The Supreme Court long ago noted one of the fundamental principals of trademark law:

"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition: the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as

3. The Court also rejects Scholastic's suggestion that even if "Classroom" had not developed a secondary meaning, such a meaning was "in the making" and the trademark should be protected. Even assuming that such a claim may be maintained under the Lanham Act, which is an open question, *see Metro Kane Imports, Ltd. v. Federated Department Stores, Inc.,* 625 F.Supp. 313, 316 (S.D.N.Y.1985) (collecting cases), no such finding is warranted here. First, Scholastic's efforts to promote "Classroom" have been minimal, and its current plans to use the name appear to be proceeding at a leisurely pace. Second, claims based on a secondary meaning "in the making," if they exist at all, may be employed only against "intentional, deliberate attempts to capitalize on a distinctive product." *Id.* The evidence in this case clearly indicates that Macmillan developed the "Creative Classroom" name on its own and did not attempt to

benefit from consumers' perceptions, if any, about Scholastic's magazine.

4. Of course, Macmillan cannot be faulted for failing to apply for registration of "Creative Classroom" in mid–1984 because "a symbol must actually have been *used* as a mark before that symbol can be registered under federal or state law." 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 16.01, at 720 (1984) (emphasis in original).

5. The Court's holding denying Scholastic's claim for trademark infringement also disposes of its claim for false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982). *See Union Mfg. Co. v. Han Baek Trading Co.,* 763 F.2d 42, 47–48 (2d Cir. 1985); *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir.1979).

his; and it is not the subject of property except in connection with an existing business."

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). Adoption and a single use of the mark may be sufficient to permit registration of the mark, but more is required if its owner seeks to use the mark to stifle the efforts of others. *See La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). In situations such as this, the Court is required to do more than merely determine which party first asserted rights to the mark because "the concept of priority in the law of trademarks is applied 'not in the calendar sense' but on the basis of 'the equities involved.'" *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir.1980), quoting *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 534 (2d Cir. 1964).

▪ The *Societe Anonyme* case, which concerned the efforts of a business "with only a nominal claim to a valuable trademark [to] bar[ ] its use by a party with a substantial financial stake in using the mark," 495 F.2d at 1271, is particularly illustrative here. There the Court reversed the district court's finding of trademark infringement because the owner of a trademark for a perfume had made only token efforts to sell its product; indeed, the owner appeared to regard its sporadic sales of the product, combined with the threat of litigation "as a relatively painless way to keep a potential competitor at bay."[6] *Id.* at 1273. Rather than establish a set rule for all circumstances, Judge Friendly instead stated that "the balance of equities plays an important role in deciding whether [the trademark owner's] use is sufficient to warrant trademark protection." *Id.* at 1274 n. 11.

▪ The balance of equities here clearly favors Macmillan. Macmillan did not copy the name of its magazine from Scholastic; it made a good faith effort to comply with trademark law; and it has devoted its energies principally to developing a new magazine for teachers. Scholastic, in contrast, has made relatively minor efforts to employ its trademark rights. As the purpose of trademark law is to protect consumers from confusion—not companies from competition—the Court must regard Macmillan's behavior here as more deserving of protection.

## IV.

Scholastic's pendent state claims for unfair competition and dilution are also without merit.

▪ First, "[t]he essence of an unfair competition claim under New York law is that the defendant misappropriated the labors and expenditures of another. Central to this notion is some element of bad faith." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) (citations omitted). Because Macmillan neither capitalized on Scholastic's labors nor demonstrated bad faith, plaintiff's unfair competition claim must fail.

Second, Scholastic seeks injunctive relief under New York's anti-dilution statute, which states:

"Likelihood of injury to business reputation or of dilution of the distinctive qualities of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 368-d.

The New York Court of Appeals has spelled out that "[t]he evil which the Legis-

---

**6.** Scholastic's extensive use of the name "Classroom" in Canada and Australia is, of course, of no relevance to its effort to create trademark rights in the United States. *See Societe Anonyme, supra*, 495 F.2d at 1270 n. 4; *cf. CBS, Inc.*

*v. Logical Games*, 719 F.2d 1237, 1239 (4th Cir. 1983) ("trade dress use in foreign countries does not create protectible trademark rights in the United States.")

lature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trademark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). As the Second Circuit has held, the "interest protected by § 368-d is not simply commercial goodwill, but the selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public." *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624–25 (2d Cir.1983).

■ Here, plainly, Scholastic's minimal efforts to promote its "Classroom" trademark in the United States never engendered any associations, favorable or otherwise, with the consuming public; thus, there is no basis for the claim that Macmillan capitalized on those associations. Because Scholastic's "Classroom" trademark did not acquire a secondary meaning, a necessary element of a dilution claim, *see Sally Gee, supra,* 699 F.2d at 625, its request for relief must be denied.

### V.

Scholastic's claims for trademark infringement, false designation of origin, common law unfair competition and statutory dilution are dismissed. Macmillan's counterclaim for cancellation of Scholastic's Registration No. 1,359,195 is dismissed without prejudice. No costs.

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

SO ORDERED.