**TALK TO ME PRODUCTS, INC., Plaintiff,**

v.

**LARAMI CORPORATION, Defendant.**

**No. 91 Civ. 4885 (CSH).**

United States District Court, S.D. New York.

Oct. 21, 1992.

**556**

Robert B. Bodzin, Lynn A. Manning, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa. (Ronald L. Panitch, Jay K. Meadway, Panitch Schwarze Jacobs & Nadel, Philadelphia, Pa., Earl Barrison, Law Offices of Earl Barrison, New York City, of counsel), for defendant Larami Corp.

Gerard F. Dunne, Wyatt, Gerber, Burke & Badie, New York City, for plaintiff Talk To Me Products, Inc.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This action arises out of plaintiff's claim that defendant has infringed its trademark for a water gun.

The case is before the court on defendant's motion for summary judgment. For the reasons stated below, the motion is granted.

### BACKGROUND

This dispute revolves around two water guns, one licensed by the plaintiff and called "The Totally Rad Soaker," the other marketed by the defendant and called "Super Soaker."[1]

Plaintiff Talk to Me Products, Inc. ("TTMP") is a New York corporation with its principal place of business in New York, New York. TTMP develops, designs and licenses various types of intellectual property. Complaint, ¶ 5; Memorandum in Opposition to the Motion for Summary Judgment ("Plaintiff's Brief") at 3.

Defendant Larami Corporation ("Larami") is a Delaware corporation with a business address in Philadelphia, Pennsylvania. Larami develops, manufactures and distributes a variety of children's toys. Def. Exh. B, Affidavit of Alvin Davis ("Davis Aff."), ¶ 3.

In November, 1988, TTMP's predecessor company, Talk To Me Programs, Inc. ("TTM");[2] granted a license to Blue Box Toy Factory, Ltd. ("Blue Box") for the technology of a battery-operated water gun capable of ejecting water in a continuous stream. *See* Affirmation of Alan B. Amron

---

1. The parties use different names when referring to plaintiff's water gun. Plaintiff calls it "The Totally Rad Soaker," while defendant calls it "The Drenchers—The Totally Rad Soaker." This disagreement may stem from the gun's packaging which contains, in the lower left hand corner, the words "The Drenchers" and, in the lower right hand corner, the words "The Totally Rad Soaker." Defendant's Exh. F.

   Brochures advertising the water gun include advertisements for two other water guns: "The Drenchers—The Totally Awesome MP–50" and "The Drenchers—The Totally Excellent M16."

Def. Exh. E. Thus, "The Drenchers" is the name of a line of water guns. Plaintiff's Response to Defendant's 3(g) statement at 1. That may also explain why the parties refer to the disputed water gun differently.

   In any case, for the purpose of simplicity, I refer to it as "The Totally Rad Soaker."

2. TTMP is the successor of the entire assets of TTM. Affirmation of Alan B. Amron, ¶ 2. Plaintiff fails to state the date of the succession, at times referring to TTM, at other times to TTMP.

("Amron Aff."), ¶ 6; Def. Notice of Motion, Exh. A, License Agreement ("Agreement"). The Agreement gave Blue Box a license to, *inter alia*, design, market, manufacture, and sell such a water gun. The Agreement also required Blue Box to pay a 5% royalty on all sales to TTM. Agreement at 2.

In early 1989, Larami began marketing an air pressure water gun under the name "Power Drencher." Davis Aff., ¶ 4; Plaintiff's 3(g) Statement at 2. In April 1990, counsel for TTM informed Larami that "Drencher" was a trademark that had previously been licensed to Blue Box for the battery-operated water gun. Davis Aff., ¶ 5. Larami then agreed, in a letter dated May 22, 1990, that it would stop using the name "Power Drencher" after it exhausted its inventory. Plaintiff's Exh. E; Amron Aff., ¶ 24. According to Larami's vice president, Larami also informed TTM that it was renaming its water gun "Soaker." Davis Aff., ¶ 5. Several months later, on August 24, 1990, Larami made its first shipment of air pressure water guns bearing the "Super Soaker" mark. Def. 3(g) Statement, ¶ 2. This shipment proved to be the first of many; Larami's vice president asserts that the "Super Soaker" "has been an overwhelming commercial success and has achieved nationwide recognition."[3] Davis Aff., ¶ 6.

Prior to Larami's first shipment of the "Super Soaker," TTMP made a single interstate sale on May 15, 1990 of a battery operated water gun called "The Totally Rad Soaker." Plaintiff's 3(g) Statement, ¶ 4. President Alan Amron of TTMP has testified, and the defendants do not dispute, that he conducted this sale by placing one water gun in a sample package designed and printed with the new name, and sold it to a buyer in Florida. Deposition of Alan Amron ("Amron Dep.") at 121–25. TTMP had previously sold this gun under the name Drenchers—which led to its letter to Larami in April—before opting to market the gun differently. Plaintiff's Brief at 4. TTMP's licensee, Blue Box, reported that it received the first order for "The Totally Rad Soaker" on August 28, 1990, and that it accomplished the first shipment on November 10, 1990. Def. Exh. H.

On July 31, 1990, plaintiff filed an intent-to-use application to register the trademark "The Totally Rad Soaker" with the United States Patent and Trademark Office ("Trademark Office") pursuant to 15 U.S.C. § 1051(b).[4] Plaintiff's Exh. A. According to Amron, the attorney with the Trademark Office was willing to approve the application if TTMP would disclaim the words "The Totally Rad." Amron made the disclaimer, and it was recorded by the Trademark Office in an interview record on February 5, 1991.[5] Plaintiff's Exh. B.

On July 18, 1991, plaintiff filed this action for federal trademark infringement under the Lanham Act, 15 U.S.C. § 1125. The plaintiff also asserted a claim under New York common law for unfair competition and trademark infringement. TTMP alleged that defendant's use of the name "Super Soaker" infringed on its rights to the trademark "Soaker." The plaintiff's complaint sought an injunction barring Larami from using the "Soaker" trademark, as well as treble damages and attorney's fees.

On August 20, 1991, the Trademark Office issued a Notice of Publication for the trademark "The Totally Rad Soaker."

---

**3.** The "Super Soaker" has also been the subject of considerable controversy. Reports of injuries have led public officials in Michigan, New Jersey, and Massachusetts to propose bans of these water guns. *See, e.g.,* Jay Mathews, "The Soaking of America," *Newsweek*, June 22, 1992, at 58.

**4.** This section holds, in pertinent part:
**(b) Trade-marks intended for use in commerce**
A person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may apply to register the trademark under this chapter on the principal register hereby established.... [b]y filing in the Patent and Trademark Office ... a written application....
15 U.S.C. § 1051(b).

**5.** A disclaimer "constitutes constructive notice to the public that the registrant disavows any claim of exclusive right to the use of the disclaimed portions of his mark, standing alone." 4A R. Callmann, *Unfair Competition, Trademarks and Monopolies*, § 25.33 at 121 (4th ed. 1983).

**558**

Plaintiff's Exh. C. Larami filed a Notice of Opposition ("Opposition Notice") on September 16, 1991. Plaintiff's Exh. D. In that Opposition Notice the defendant stated that a predecessor-in-interest had used the trademark "Super Soaker" from as early as 1989, and that Larami acquired the mark in 1990. *Id.*, ¶ 3. Larami also denied that there is a likelihood of confusion between the two marks. *Id.*, ¶ 6. To the extent that confusion exists, however, Larami asserted that it had prior rights and that any injury accruing from confusion works to Larami's detriment, not TTMP's. *Id.*, ¶¶ 6–11.

### DISCUSSION

Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance,* 804 F.2d 9 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. As the Supreme Court has held, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

▮ Larami moves for summary judgment under three different theories: 1) that TTMP has no right to sue under the "Soaker" mark because it cannot establish priority of use; 2) that TTMP's mark is not eligible for trademark protection because the mark is not inherently distinctive and TTMP cannot demonstrate "secondary meaning"; that is, it cannot show that the public has drawn a link between the "Soaker" mark and the water gun that TTMP sells; and 3) that TTMP cannot show that Larami's use of the "Soaker" mark is likely to cause confusion.[6]

### 1. *Priority of Use*

▮ While TTMP has applied to the Trademark Office, Larami opposes that application and, so far as appears, the agency has not acted. Accordingly, "Soaker" is not a registered trademark. TTMP must therefore rely on Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *See, e.g., Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir., 1992). As the Supreme Court stated, "it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

Section 43(a) of the Lanham Act provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading de-

---

**6.** The summary judgment motion applies to both the state and federal claims. This is because the "test for trademark infringement governs both the federal trademark infringement claims and New York Business Law trademark infringement and unfair competition claims." *Sasson Jeans, Inc. v. Sasson Jeans, LA, Inc.,* 632 F.Supp. 1525, 1528 (S.D.N.Y.1986) (citation omitted); *see also Safeway Stores, Inc. v. Safe-*

*way Properties, Inc.,* 307 F.2d 495, 497 n. 1 (2d Cir.1962) ("no difference" between principles of federal unfair competition law and New York unfair competition law); *Wonder Labs, Inc. v. Procter & Gamble Co.,* 728 F.Supp. 1058, 1067 (S.D.N.Y.1990) ("standard for unfair competition under New York law is very similar to the standards of the Lanham Act.") (citations omitted).

scription of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a).

■ The exclusive right to a distinctive mark belongs to the one who first uses it in connection with a particular line of business. *McLean v. Fleming*, 96 U.S. 245, 24 L.Ed. 828 (1877); 3 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 19.01 (4th ed. 1983). This "first actual use," or "prior use", must be deliberate and continuous in order to confer ownership rights:

[T]he right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974).

The initial question in the case at bar is whether TTMP used the mark "Soaker" before Larami and, if so, whether the nature of that use gave it exclusive ownership rights. Larami concedes that plaintiff sold a product bearing the term "Soaker" before Larami: TTMP accomplished a single sale of the "Totally Rad Soaker" on May 15, 1990, and Larami did not ship any "Super Soakers" until August 24, 1990.

What Larami does challenge is the significance of TTMP's first sale. The defendant

claims that this was merely a "token sale" and, without more, is "meaningless." Def. Brief at 9–10. According to Larami, TTMP's attempted appropriation of the "Soaker" mark was "inconsequential," "*de minimis*," and falls short of establishing enforceable rights over the mark. *Id.* at 10–11.

Plaintiff urges the Court to look beyond the May 15 sale. Since TTMP had demonstrated its intention to adopt the mark before this sale, or at least before Larami introduced the "Super Soaker," it claims that it established prior use. Alternatively, TTMP notes that it filed an application to register "The Totally Rad Soaker" mark with the Trademark Office on July 31, 1990, while Larami did not make its first shipment of "Super Soaker" water guns until August 24, 1990. By virtue of the filing date, TTMP argues, it acquired priority rights over Larami.

■ TTMP claims that its filing implicates the Trademark Law Revision Act of 1988, 15 U.S.C. § 1051 *et seq.* Congress included a provision in the new Act that fixed a trademark claimant's priority rights from the filing date of its application for registration. 15 U.S.C. § 1057(c). This section provides in pertinent part:

**(c) Application to register mark considered constructive use**

Contingent on the registration of a mark on the principal register provided by this chapter, the filing of the application to register such mark shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect, on or in connection with the goods or services specified in the registration against any other person. . . .

TTMP relies on this section in asserting prior use. A plain reading of the text, however, does not support plaintiff's claim. An application may confer a right of priority, but this is only triggered by registration. TTMP's "Totally Rad Soaker" mark is not registered. Until it is, TTMP cannot rely on the constructive use provision of the new Act. *See Windows User, Inc. v. Reed Business Publishing Ltd.*, 795

F.Supp. 103, 107 (S.D.N.Y.1992) (noting that Congress "expressly provided" that constructive use is contingent upon registration). In *Windows User* Judge Knapp gave no effect under § 1057(c) to an intent-to-use application which had been filed and rejected by the agency. *Id.* at 105.

The case TTMP relies on, *Sirco Corporation v. American Telephone and Telegraph Company*, U.S. Patent and Trademark Board, No. 84,979 (Oct. 21, 1991), is not to the contrary. In that case, the Board reviewed the legislative history of the Act and held that registration is not a prerequisite for conferring priority rights. Plaintiff's Brief, Exh. A, slip op. at 7. But the Board issued its opinion in a different context from the summary judgment motion now before this Court. There, the party relying on the registration requirement was doing so in order to defeat the intent-to-use applicant's registration efforts. The Board saw no logic in permitting the registration requirement to extinguish the benefits of applying, when the statute's purpose was precisely the opposite—to encourage more businesses to make intent-to-use applications. *Id.* Here, Larami relies on the requirement to defeat plaintiff's suit against it.

To the extent that the Board's reading of § 1057(c) might apply to the case at bar, I respectfully disagree with it. As the Supreme Court has held:

> We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete."

*Connecticut Nat. Bank v. Germain*, — U.S. —, —, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted). Section 1057(c) is unambiguous. If Congress intended for constructive use to apply to a dispute like the case at bar, but drafted the statute carelessly, Congress can redraft it.

It is true that "in rare and exceptional circumstances," a court may consider the legislative history of a statute containing unambiguous language. *United States*

*v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986). As the Second Circuit stated recently, "we may turn to other canons of construction [of an unambiguous statute] only to determine whether there is a 'clearly expressed legislative intention' contrary to that language, which would require us to question the virtually conclusive presumption that congress meant what it said." *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1350, 1358 (2d Cir.1992) (quoting *James*, 478 U.S. at 606, 106 S.Ct. at 3121), *cert. granted*, — U.S. —, 113 S.Ct. 52, 121 L.Ed.2d 22 (1992).

I have reviewed the legislative history of the Trademark Law Revision Act and find no such "clearly expressed intention." The Senate Committee Report observes, for example, that the constructive use rights are "conditional" and not triggered until registration. Senate Report No. 100–515, 7 *U.S.Code Congressional and Administrative News* (1988), 5577, 5592. This requirement does limit, to be sure, the benefits gained from filing an intent-to-use application. But it does not remove every benefit in one fell swoop.

The central purpose of § 1057(c)—to foster intent-to-use applications—remains intact. An applicant obtains the advantage of constructive use. He just does not gain that advantage until his mark is registered. Accordingly, I find that while the Board's interpretation of the legislative history is certainly arguable, the record is far from clear. Anything short of clarity compels a plain reading of the statute.

In the case at bar, TTMP's application to register its mark on the Principal Register is pending, opposed by Larami. The mark has not been registered. Therefore the contingency expressly required by Congress has not come to pass, and TTMP cannot derive any rights from § 1057(c). This case differs from *Windows User* in that TTMP's application is still pending, but it is a distinction without a difference. As in *Windows User*, the applicant's contingent rights have not vested.

Because the constructive use provision of the Trademark Law Revision Act

does not apply, who acquired priority rights depends on who accomplished "the first actual use." The defendant claims that actual use requires "an ongoing program to exploit the mark." *Anvil Brand, Inc. v. Consolidated Foods Corp.*, 464 F.Supp. 474, 481 (S.D.N.Y.1978) (quoting *La Societe*, 495 F.2d at 1271). The plaintiff claims that in a contest between two companies who began using a mark at approximately the same time, intentions matter. Citing *George Washington Mint v. Washington Mint, Inc.*, 349 F.Supp. 255 (S.D.N.Y.1972), TTMP states that because it intended to use the "Soaker" mark prior to Larami, it established the first actual use.

Larami properly cites the law in this circuit; TTMP does not. Indeed, the plaintiff either misreads or misrepresents *George Washington Mint.* That case says nothing about honoring intentions in a contest over who used a mark first. Instead, it holds that the prior user is not necessarily the one who made the first sale, but the one who received the first order for trademarked goods. 349 F.Supp. at 261. Since Larami actually shipped "Super Soakers" on August 24, 1990 and TTMP received its first order on August 28, 1990, *George Washington Mint* supports Larami, not TTMP.

Well-established principles and case law governing first use also favor Larami. "Trademark use must be bona fide, i.e., more than a pro forma use; for example, a single sale, for the sole purpose of laying the foundation for a claim of use, cannot be seriously considered." 3 R. Callmann, § 19.09 at 26 (similar excerpt in earlier edition of treatise *quoted in D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1270 (S.D.N.Y.1970)); *Windows User, Inc. v. Reed Business Publishing Ltd*, 795 F.Supp. 103, 108 ("The talismanic test is whether or not the mark was used 'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.' ") (citation omitted); *Jaffe v. Simon & Schuster*, 3 U.S.P.Q.2d 1047, 1049, 1987 WL 124312 (S.D.N.Y.1987) (nominal or token sales to personal friends and relative not sufficient); *Scholastic, Inc. v. Macmillan Inc.*, 650 F.Supp. 866, 872, 2 U.S.P.Q.2d 1191, 1196 (S.D.N.Y.1987) ("Adoption and a single use of the mark may be sufficient to permit registration of the mark, but more is required if its owner seeks to use the mark to stifle the efforts of others."); *D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1270–71 (S.D.N.Y. 1970) ("The mark must be so used that it comes to the attention of wholesale or retail purchasers in association with, and as a means of identifying, the product.... First user does not refer to the party who was prior in time, but 'first in the specific trade.' ") (citations omitted).

In describing the May 15, 1990 sale, TTMP's president stated: "What I did was I bought a Soaker gun from Blue Box and I sold it to a person in Florida, out of state, trying to establish a trademark name, which I do as a matter of casual sale." Amron Dep. at 121–22. That is plainly inadequate to establish priority of use.

Between the May 15 sale and Larami's first shipment of "Super Soakers" on August 24, TTMP's only public action involving the mark was to apply to register "The Totally Rad Soaker" trademark. Since § 1057(c) of the Trademark Law Revision Act has no office to perform here, the plaintiff's intent-to-use application has no relevance to a claim of prior use. *See, e.g., Jaffe,* 3 U.S.P.Q.2d at 1049 ("[T]he fact that the plaintiff was the first to file an application to register the mark does not bolster his case. Ownership of a mark is not determined by the race to the Patent Office, but by the race to the market.").

The lack of prior use dooms plaintiff's suit. TTMP cannot show first actual use even though the Court has resolved all ambiguities of fact in favor of TTMP—as it must on this motion for summary judgment. Given the strength of defendant's second argument, however, I decline to rest my holding solely on first use grounds.

### 2. Type of Trademark and Secondary Meaning

The core inquiry in § 43(a) cases is whether the use of a mark causes consum-

er confusion. But courts will not address this issue unless the plaintiff's mark qualifies for § 43(a) protection. *See, e.g., Bristol–Myers,* at 1038. Qualification, in turn, requires classifying the mark according to the system established by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). That system features four classes of marks, arrayed in ascending order of strength: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Abercrombie & Fitch,* 537 F.2d at 9.

Suggestive and arbitrary marks "are deemed inherently distinctive and entitled to protection" because "their intrinsic nature serves to identify a particular source of a product." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757. A generic mark is never entitled to protection. *Id.* A descriptive mark is eligible for protection "if it 'has become distinctive of the [producer's] goods in commerce.' This acquired distinctiveness is generally called 'secondary meaning.'" *Id.* (citations omitted). Secondary meaning attaches to a particular mark when "a significant number of prospective purchasers understand the term when used in connection with the particular kinds of goods involved ... as indicative of an association with a specific entity." *Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1343 (2d Cir.1992) (citation omitted).

Since a finding that "Soaker" is descriptive would also require TTMP to show secondary meaning, the parties dispute how to characterize the mark. TTMP asserts that "Soaker" is suggestive, while Larami argues it is descriptive.

The Second Circuit recently reviewed the meanings of the two terms:

A descriptive mark is one that "'forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.'" *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted). "[A] term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product." *20th Century Wear v. Sanmark–Stardust,* 747 F.2d 81, 88 (2d Cir. 1984), *cert. denied,* 470 U.S. 1052 [105

S.Ct. 1755, 84 L.Ed.2d 818] (1985). A term is suggestive "'if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.'" *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted).

*Bristol–Myers,* 973 F.2d at 1040.

Despite these well-established definitions, courts have struggled with the distinction between suggestive and descriptive marks ever since *Abercrombie & Fitch.* Indeed, the Second Circuit has observed that determining the appropriate category requires "pigeonholing or labeling," and "has always been a slippery business." *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 747 F.2d 81, 87 (2d Cir. 1984). Acknowledging this again in *Bristol–Myers,* the Court stated that "the line between descriptive and suggestive may be difficult to discern." 973 F.2d at 1040.

While this determination is often difficult, in the case at bar there can be no doubt as to the proper classification. When a court assesses a trademark it must be mindful that "[t]he focus in categorizing a mark is on how the words are used *in context* rather than their meaning in the abstract." *Id.* at 1041 (emphasis added). As a leading trademark commentator explained: "the word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used for apples." 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 11:22, at 498–99 (2d ed. 1984), *quoted in Bristol–Myers,* at 1041. In the context of a water gun, the term "Soaker" describes an essential "purpose or utility" of the product. It is therefore a descriptive mark.

TTMP relies on the Second Circuit's decision in *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70 (2d Cir.1988). In *Hasbro,* the Court held that the term "Gung–Ho" was suggestive as applied to a toy Marine action figure because the term merely described elements of the personality attributed to the toy. 858 F.2d at 75. That case is a far cry from the case at bar. "Soaker"

describes what a water gun is and does. Indeed, the conclusion that "Soaker" is descriptive "is bolstered by the concern that 'exclusive use of the term might unfairly "monopolize" common speech.'" *Bernard*, 964 F.2d at 1342 (quoting *20th Century Wear*, 747 F.2d at 90). If the Court were to hold that the "Soaker" mark is suggestive as applied to water guns, TTMP would deplete the language of a useful descriptive term.[7]

A review of trademark cases where marks were held descriptive further supports this Court's conclusion. *See Bristol-Myers*, at 1040–41 ("PM" for analgesic pain reliever with a sleep aid); *Bernard*, 964 F.2d at 1341 ("Arthriticare" for analgesic gel designed to relieve arthritis pain); *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563–64 (2d Cir.1990) ("PaperCutter" for corporation which sells paper designs and ornaments); *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir.1985) ("Sportscreme" for topical heat analgesic); *20th Century Wear*, 747 F.2d at 87–88 ("Cozy Warm ENERGY-SAVERS" for pajamas and nightgowns); *Feathercombs, Inc. v. Solo Prods. Corp.*, 306 F.2d 251, 255 (2d Cir.) ("Featherlight" for hair rollers), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962); *see also Remington Prods., Inc. v. North Am. Philips Corp.*, 892 F.2d 1576, 1580–82 (Fed. Cir.1990) ("Travel Care" for pressing irons); *Karmikel Corp. v. May Dept. Stores Co., Inc.*, 658 F.Supp. 1361, 1370 (S.D.N.Y. 1987) ("Fast Track" for athletic wear); *Scholastic, Inc. v. Macmillan, Inc.*, 650 F.Supp. 866, 871 (S.D.N.Y.1987) ("Classroom" for magazine directed at teachers and students).

In urging the Court to view its mark as suggestive, TTMP also notes that the Trademark Office decided to register the mark "The Totally Rad Soaker." TTMP correctly cites several Second Circuit cases for the proposition that registration affords a rebuttable presumption that the mark is more than merely descriptive. *See, e.g.,*

*PaperCutter, Inc. v. Fay's Drug Co., Inc.,* 900 F.2d 558, 563 (2d Cir.1990).

But this argument is flawed. First, the Trademark Office has not actually registered "The Totally Rad Soaker." Larami has filed a Notice of Opposition and, as far as the Court is aware, the mark has not yet been registered. Second, and more importantly, "the presumption may be rebutted by a showing that the mark is descriptive, not suggestive." *Id.* As the Second Circuit did in *PaperCutter*, I hold that the presumption has been rebutted.

Because the term "Soaker" is descriptive, TTMP must demonstrate secondary meaning. In order to do that, TTMP must answer "[t]he crucial question [of] whether the public is moved to buy the product because of its source. To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Murphy v. Provident Mut. Life Ins. Co. of Philadelphia*, 923 F.2d 923, 928 (2d Cir. 1990) (quoting *Inwood Laboratories, Inc., v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). But the plaintiff has not even addressed secondary meaning in its papers. Given the governing law and the facts of this case, plaintiff's omission is not surprising.

"To qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark." *PaperCutter*, 900 F.2d at 564. "Even if secondary meaning is acquired, it will not prevent the use of the term by one whose use had begun before the secondary meaning is acquired." *Brown v. Quiniou*, 744 F.Supp. 463, 469–70 (S.D.N.Y.1990) (quoting *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980)).

TTMP would have to show that it acquired secondary meaning prior to Lara-

---

7. Larami's account of how it chose "Super Soaker" highlights this problem. Larami originally decided to call its water gun "Drencher." When it learned of TTMP's prior use, it selected another word describing a water gun—"Soaker."

mi's first shipment of water guns on August 24, 1990. Since the only sale it made prior to August 24, 1990 was the single sale of a water gun on May 15, 1990, such a showing is inconceivable. For plaintiff to pursue its claims at trial would therefore be an exercise in futility.

### 3. Likelihood of Confusion

If a mark is not inherently distinctive, secondary meaning is a prerequisite for protection under section 43(a) of the Lanham Act. *E.g., Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758. Since TTMP cannot demonstrate that "Soaker" is either inherently distinctive or has acquired secondary meaning, I need not consider Larami's likelihood of confusion argument.

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to dismiss the complaint with prejudice.

It is SO ORDERED.