**LUCENT INFORMATION MANAGEMENT, INC.,**
Plaintiff,

v.

**LUCENT TECHNOLOGIES, INC., Defendant.**

**No. CIV.A.96–450–RRM.**

United States District Court,
D. Delaware.

Nov. 5, 1997.

N. Richard Powers, Harold Pezzner, Connolly, Bove, Lodge & Hutz, Wilmington, DE, Richard I. Samuel, Jill C. Greenwald, Cobrin Gittes & Samuel, New York, NY, for plaintiff.

Donald F. Parsons, Jr., Karen L. Pascale, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Robert M. Newbury, Mark V.B. Partridge, Bradley L. Cohn, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, IL, Mari M. Gursky Shaw, Lauren S. Kellner, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Philadelphia, PA, for defendant.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a trademark case. Plaintiff Lucent Information Management, Inc. ("LIM") is a Pennsylvania corporation specializing in computer document management systems. Defendant Lucent Technologies, Inc. ("LTI") is a Delaware corporation that provides goods and services in telecommunication and information systems.

LIM filed a complaint on September 12, 1996, alleging that LTI is engaging in trademark infringement in violation of federal law, 15 U.S.C. § 1125(a), through its use of the mark LUCENT. LIM also alleges that LTI is engaging in service mark infringement, tradename infringement, and unfair competition under Delaware common law. Finally, LIM alleges that LTI is violating the Delaware Uniform Deceptive Trade Practices Act, Del. code ann. tit. 6, § 2532 (1974). On October 3, 1996, LTI filed an answer to LIM's complaint, in which it denies the allegations and raises several affirmative defenses.

On July 3, 1997 LTI moved for summary judgment as to Counts I through V, the claims listed in LIM's September 12, 1996 complaint. LTI argues that its use of the LUCENT mark is not infringement because LIM can not establish use prior to LTI's registration of an intent-to-use application with the Patent and Trademark Office.

On July 1, 1997, LIM moved for partial summary judgment that its claims are not barred by the first three affirmative defenses raised in LTI's answer. These defenses each relate to correspondence that LIM exchanged with LTI. LTI claims that this correspondence constitutes an agreement between the parties that bars LIM's suit, or alternatively that the correspondence is an admission by LIM that LTI is not infringing the mark. This is the court's decision on these summary judgment motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Both parties submitted briefs in support of their positions on the summary judgment motions. The parties also submitted excerpts from the transcripts of several depositions taken during discovery, as well as selected documents produced during discovery. The court draws the following facts from the parties' pleadings, the parties' briefs, and the evidentiary submissions.

### A. LIM's Adoption and Use of Mark

LIM was formed in 1995 by four individuals: Norman Feinstein, Samuel Weinberg, Edward Eisen, and Cliff Armstrong. They formed the company in order to offer services for document imaging and management. On August 22, 1995, the company filed Articles of Incorporation in the Commonwealth of Pennsylvania under the name "Lucent Systems Corporation." On September 22, 1995, the company changed its name to Lucent Information Management.

LIM's office was set up using space within the building owned by Mr. Feinstein's other business, Corporate Consultants, Inc. LIM is still located there today. Two Corporate Consultants employees do all of LIM's clerical work and bookkeeping. These two employees do not receive payment from LIM.

On September 5, 1995, Mr. Feinstein sent out a letter on Corporate Consultants letterhead to approximately 50 people, announcing the formation of LIM and the goals of the company. Around this same time, LIM hired a graphics designer to develop a design for such things as a logo, letterhead, message pads, labels, and brochures.

On October 5, 1995, Mr. Armstrong installed a modem at the Israel Bonds office in Philadelphia. The request for the modem was made by Harriet Potashnick, who Mr. Armstrong knew personally, through Mr. Feinstein. Mr. Armstrong indicated in his deposition, taken in connection with this case, that he did not provide any written materials on LIM to Ms. Potashnick at the time of the sale. He did not have any written correspondence about the transaction with her, and does not recall from whom he obtained the modem. Ms. Potashnick has since produced an invoice for the transaction from the Israel Bonds office files. The invoice has the name and address of LIM at the top, is dated October 15, 1995, and requests that the check be made payable to Cliff Armstrong. Ms. Potashnick has also produced a copy of a check from an Israel Bonds bank account dated October 31, 1995, signed by Ms. Potashnick, payable to Cliff Armstrong for $323.50.

On October 16, 1995, LIM met with Corporate Consultants to discuss products and services that could be used by Corporate Consultants. Corporate Consultants' records indicate they were using File Magic Plus, a system that LIM sells and offers services for, as early as November 12, 1995.

In November 1995, LIM made sales presentations to ARAMARK in Philadelphia, to NBC in New York City, and to Nixon Uniform in Delaware. Between December 1, 1995, and February 5, 1996, LIM made approximately 12 additional sales presentations, to a total of about 50 people. On February 16, 1996, LIM entered into a support agreement for document management software with a local bank.

LIM has continued to try and build its business. Through 1996 LIM had made sales with total gross revenues of approximately $138,000.00.

### B. LTI's Adoption and Use of Mark

In 1995, AT & T began the process of creating a spinoff company, which would focus on telecommunication systems and technology. That fall, AT & T hired an outside firm to generate possible names for the new company. One of the suggested names was "Lucent." AT & T's trademark counsel, Frank L. Politano, coordinated efforts to find a name for the spinoff company.

In November, 1995, AT & T obtained two full trademark reports and a trade name search for LUCENT. One of these reports, prepared by Thompson & Thompson, lists LIM. The report is 82 pages longs and lists all the company names that were produced by a series of computer database searches. The searches looked for such things as the word "Lucent," or the combination of letters "LUC" in a company name. Searches were performed in a database of PTO references, in a state trademark database, and in common law libraries and databases. In one online search, LIM is listed as a Pennsylvania corporation, along with 65 other companies.

On November 30, 1995, AT&T filed an intent-to-use ("ITU") application with the PTO for the mark LUCENT for classes 9, 37 and 42. These classes cover a wide range of goods and services, including telecommunications products, designs for telecommunications systems, and telecommunications computer programs and networks. The application was allowed by the PTO on June 10, 1997. LTI has since filed statements of use. The registration has not yet been issued.

On January 30, 1996, LTI purchased the rights to the mark LUCENT SYSTEMS and the Internet domain name LUCENT.COM from a California corporation called Lucent Systems, Inc. Lucent Systems was a computer consulting company that had used the

LUCENT name and mark from 1987 through 1996. After the sale of the name, Lucent Systems changed its name to Denken Systems, Inc. and continued to do computer consulting work.

On February 5, 1996, AT & T announced that its spinoff company would be named "Lucent Technologies, Inc." Major newspapers all across the country reported this announcement. LTI mailed out announcements to over 1.2 million people.

### C. *Dealings Between LIM and LTI*

On March 15, 1996, LIM's trademark attorney, John Caldwell sent a letter to LTI objecting to LTI's use of the name LUCENT, and claiming that LIM had already adopted and used this name on a nationwide basis.

On April 12, 1996, LTI's trademark counsel, R.A. Ryan, responded to the March 15 letter from LIM. Ms. Ryan stated that she did not agree that LTI's use of the name Lucent Technologies creates a likelihood of confusion. She explained that in her opinion the two companies' markets do not overlap, and their products and services are not confusingly similar.

On April 29, 1996, LIM filed an application with the United States Patent and Trademark Office (" the PTO") to register the mark "Lucent" for computer and office-related services. The application claimed that LIM first used the mark on March 6, 1996.

Mr. Caldwell responded to LTI's letter with a proposed agreement ("the Agreement"), in which each party would agree to refrain from opposing the other's registration of the mark LUCENT, and to use trade dress, advertising, and marketing in a way that would avoid significant likelihood of confusion. The Agreement was never signed by the parties.

On June 25, 1996, Richard Samuel wrote a letter to Ms. Ryan indicating that he was taking over representation of LIM in the matter, and that any previous offers of settlement by LIM were withdrawn.

On September 12, 1996, LIM filed suit against LTI. The complaint alleges that LTI infringes LIM's trademark in violation of federal trademark law, 15 U.S.C. § 1125(a). It also alleges that LTI is violating the common law of the State of Delaware as it relates to service marks, tradename infringement, and unfair competition. Finally, it alleges that LTI is violating the Delaware Uniform Deceptive Trade Practices Act. *See* Del. code ann. tit. 6, § 2532 (1974).

On October 3, 1996, LTI filed an answer to LIM's complaint. In the answer, LTI denies the allegations and raises several affirmative defenses. Three of these defenses are based on the correspondence and proposed agreement between the parties. LTI argues that these documents either comprise an agreement in principle to settle the claims, or an admission by LIM that there is no likelihood of confusion. Alternatively, LTI argues that LIM is equitably estopped from maintaining this action.

On December 27, 1996, LIM submitted a proposed amendment to its registration application, claiming that its first use of the LUCENT mark was the September 5, 1995 letter announcing the creation of the company.

During discovery, LTI submitted a set of interrogatories to LIM, asking LIM to list its monthly revenues from June 1, 1995. LIM submitted revenue numbers starting with "$0.00" for January 1996. When asked to identify each product or service sold under the LUCENT name, and to give the date of first sale, the first item listed by LIM was the February 16, 1996 support agreement.

During the course of discovery, LTI hired Data Development Corporation, who conducted a survey on the issue of likelihood of confusion. The survey used two letters that were very similar to the letter sent out by LIM on September 5, 1995. One of the letters was the same except that the letterhead was LIM's (instead of Corporate Consultants, Inc.), and had a new date (contemporaneous with the survey). The second letter was a modified version of the original LIM letter, introducing the services of a fictitious company called "Lucent Lighting Management." Participants in the survey were told they would be getting a package by Federal Express, and to keep the pack-

age closed until they were called. Surveyors would then call and ask the participants to open the package, read the letters, and respond to questions about the letters. Data Development sent the survey to over 200 people.

After learning of the survey, LIM applied to register its letter with the United States Copyright Office in February 1997. On May 14, 1997, LIM filed a supplemental complaint, adding five additional claims. The first four of these claims (Counts VI through IX) all involve the use of LIM's September 5, 1995 letter in the Data Development survey. The claims are for copyright infringement, tortious interference, Lanham Act violations, and trade libel.

The supplemental complaint also adds Count X, which is for fraud in the inducement. This claim is raised in response to LTI's argument that the correspondence and proposed Agreement between the parties estops LIM from proceeding. LIM claims that if the court finds that there was an agreement, despite LIM's claim that there was not, then LTI committed fraud in inducing the agreement with LIM.

In a telephone conference on July 31, 1997, the court bifurcated these new claims, Counts VI through X, on the grounds that the issues involved were distinct from the original issues, and that their presentation would be a distraction and possible obstacle to the resolution of the original claims on their merits.

On July 1, 1997, LIM filed a motion for partial summary judgment. LIM asks the court to find that its claims are not barred by any of LTI's first three affirmative defenses. These defenses each deal with the Agreement and its related correspondence. LIM argues that there was no agreement or admission by LIM, and that LTI has not met its burden of showing evidence to establish the existence of an agreement or admission.

On July 3, 1997, LTI filed a motion for summary judgment on Counts I through V. This is the court's decision on these motions.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Id.* at 323, 106 S.Ct. at 2552–53. However, the moving party need not support its motion with affidavits or other documents disproving the nonmoving party's claim, but need only "show[]—that is point[] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The nonmoving party must then go beyond the pleadings and through affidavits or other evidence demonstrate the existence of a genuine issue of material fact. *Id.* at 324, 106 S.Ct. at 2553. In making this evidentiary demonstration, the nonmoving party "must introduce more than a mere scintilla of evidence showing that there is a genuine issue for trial; [he] must introduce evidence from which a rational finder of fact could find in [his] favor." *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1020 (3d Cir.1991) (quotations and citations omitted). However, the district court is required to construe the evidentiary record so as to give the nonmoving party reasonable factual inferences. *Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 112 (3d Cir.1996).

### B. Can LIM Establish "Prior Use?"

#### 1. LTI's Priority Date

Section 7(c) of the Lanham Act states that "the filing of an application to register [a

trademark] shall ... confer[] a right of priority, nationwide in effect, ... against any other person except for a person ... who, prior to such filing, has used the mark." 15 U.S.C. § 1057(c). This provision applies to ITU applications such as the one filed by LTI in this case, since an ITU application is considered an application to register a mark under 15 U.S.C. § 1051(b). *See Zirco Corp.*, 21 U.S.P.Q.2d 1542, 1543–44, 1991 WL 332553 (Trademark Tr. & App. Bd.1992) ("Section 7(c) ... is intended to fix a registrant's nationwide priority rights in its mark from the filing date of its application whether the application is based on use or intent-to-use."). Thus, LTI's ITU application, filed on November 30, 1995, confers priority to LTI over anyone who uses the mark after that date.

LIM has suggested that it is inappropriate to use the November 30, 1995 application date because LTI has not yet been granted the actual application. However, LTI may rely on this date in defending an action. To find otherwise would "eviscerate the ITU provisions and defeat their very purpose." *WarnerVision Entertainment Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261–62 (2d Cir.1996) (finding that ITU filing date can be used in defense of trademark infringement suit, and distinguishing the case from one where the date is used to seek affirmative or offensive relief). *See also Talk to Me Products, Inc. v. Larami Corp.*, 804 F.Supp. 555, 560 (S.D.N.Y.1992) (finding that a plaintiff may not rely on the filing date of its own ITU application to show priority where registration has not yet occurred, but distinguishing the case where a party relies on the date of their ITU application against someone who is attempting to defeat their registration efforts); *Zirco*, 21 U.S.P.Q.2d at 1544 (holding that "there can be no doubt but that ... an intent-to-use applicant can rely upon this date in an opposition brought by a third party asserting common law rights"). Thus, LIM must show that it had ownership rights in the LUCENT mark prior to November 30, 1995.

### 2. *LIM's Rights Prior to November 30, 1995*

■ LIM did not apply for registration of the mark until April 1996. Therefore LIM can not rely upon statutorily conferred priority of ownership under the Lanham Act through registration and use. *See* 15 U.S.C. § 1057. However, trademark ownership is not solely established by registration. *See Jaffe v. Simon & Schuster Inc.*, 3 U.S.P.Q.2d 1047, 1049, 1987 WL 124312 (S.D.N.Y.1987) ("Ownership of a mark is not determined by the race to the Patent Office, but by the race to the market."). Trademark ownership is categorized and documented by the registration procedures, but is "acquired by adoption and use" according to common law traditions. *Hydro–Dynamics, Inc. v. George Putnam & Company, Inc.*, 811 F.2d 1470, 1473 (Fed.Cir. 1987) (citing *Armstrong Paint & Varnish Works v. Nu–Enamel Corp.*, 305 U.S. 315, 334, 59 S.Ct. 191, 200–01, 83 L.Ed. 195 (1938)). Thus, LIM can establish ownership of the LUCENT mark, prior to the date of LTI's ITU application, by showing that LIM had already "adopted and used" the mark.

■ Determining the amount of activity that constitutes "adoption and use" involves an inquiry into the facts of each case. *Windows User, Inc. v. Reed Business Publishing Ltd.*, 795 F.Supp. 103, 109 (S.D.N.Y.1992). A similar inquiry is done by the PTO when considering applications for registration. The Lanham Act offers two ways to register a mark: (1) where the mark was already "used in commerce," 15 U.S.C. § 1051(a); and (2) where the party "intends to use" the mark, 15 U.S.C. § 1051(b). The "intends to use" statute requires the party to subsequently file a verified statement that the mark was actually "used in commerce." § 1051(d). Thus, either way, registration of a trademark requires that the mark be "used." The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. The Act goes on to say that a mark shall be deemed to be in use when it is placed on goods and shipped or sold.

■ However, in the absence of registration, the "use" required to establish trademark ownership under the common law is not the same as the "use" required to register the mark and be granted a priority date.

*Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir.1992) ("[U]se sufficient to register a mark that soon is widely distributed is not necessarily enough to acquire rights in the absence of registration."). The "use" that satisfies the registration requirement may not be sufficient "if [the] owner seeks to use the mark to stifle the efforts of others." *Talk to Me Products*, 804 F.Supp. at 561. Thus, the standard for determining which activities will establish ownership of a trademark without registration is much stricter than the standard for determining whether a mark is registrable. LIM must establish that its use of the LUCENT mark, prior to November 30, 1995, was not just enough to support an application for registration, but rather was extensive enough to establish common law trademark rights.

### 3. LIM's Activities Prior to November 30, 1995

■ Use sufficient to establish common law trademark rights must be "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Blue Bell, Inc., v. Farah Manufacturing Company, Inc.*, 508 F.2d 1260, 1266 (5th Cir.1975). The activities "must have substantial impact on the purchasing public." *T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372, 1376 (Fed.Cir.1996).

■ The activities that LIM engaged in prior to the date of LTI's ITU application date can be divided into two basic categories. The first is advertising and promotion. The second is sales. The court will address these two categories in turn.

### a. Advertising and Promotion

■ To establish prior use and the resulting ownership of a trademark, actual sales of goods are not necessarily required. *See WarnerVision Entertainment Inc. v. Empire of Carolina Inc.*, 915 F.Supp. 639, 645 (S.D.N.Y.1996), *aff'd in part and rev'd in part*, 101 F.3d 259 (2d Cir.1996). It is possible for a party to show use of a term in a manner "analogous" to the traditional trademark use, which normally involves a sale. *See T.A.B. Systems*, 77 F.3d at 1375 (citing

*Steer Inn Sys., Inc. v. Laughner's Drive–In, Inc.*, 56 CCPA 911, 405 F.2d 1401 (Cust. & Pat.App1969)).

■ For advertising alone to constitute use it must be "of sufficient clarity and repetition to create the required identification [and] must have reached a substantial portion of the public that might be expected to purchase the service." *T.A.B. Systems*, 77 F.3d at 1377. Several courts have held that advertising alone can not be enough to constitute use. *See, e.g., Blue Bell*, 508 F.2d at 1265; *Steer Inn Systems*, 56 CCPA 911, 405 F.2d 1401 (finding that use of the mark on an office door sign, letterheads and architectural drawings was not enough to prove prior use).

LIM sent out a letter on September 5, 1995, announcing the new business and its name. The letter was on Corporate Consultants letterhead. LIM also made several product presentations during the month of November. However, the court concludes that these letters and presentations were not extensive enough to satisfy the standard of "popularization in the public mind." *T.A.B. Systems*, 77 F.3d at 1377. In fact, LIM itself admits that the cases where analogous use was found sufficient to establish prior rights "are entirely inapplicable to the case at bar." Docket Item ("D.I.") 72 at 29. Thus the court concludes that no reasonable trier of fact could find the advertising and promotional activities of LIM to qualify as prior use.

### b. Sales

While a sale or sales is not the "sine qua non of a use," *Blue Bell*, 508 F.2d at 1265, it is good evidence of "activity which would create an association in the mind of the consumer public between [the owners of the mark] and said mark." *Windows User*, 795 F.Supp. at 109.

LIM has produced an invoice for the sale of a modem to the Israel Bonds Office, dated October 16, 1995, and a check from the Israel Bonds Office to Cliff Armstrong for $323.50. This transaction does not appear anywhere on LIM's Transaction Report, which begins on September 20, 1995. The customer contact at Israel Bonds was Harriet Potashnick, a friend of Mr. Armstrong and of Mr. Fein-

stein. In interrogatories, LIM has indicated that its first sale was not made until 1996. However, viewing this evidence in the light most favorable to LIM, the court will assume that the Israel Bonds transaction constituted a sale of goods by LIM. There are no other transactions prior to November 30, 1995 that could be considered a sale by LIM.

LIM claims that the one sale is enough to establish priority over LTI. In *Blue Bell*, 508 F.2d 1260, at 1265, the Fifth Circuit found that "even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." Indeed, traditional common law concepts teach that "ownership of a trademark accrues when goods bearing the mark are placed on the market." *Id.*, (citing *Wallace & Co. v. Repetti*, 266 F. 307 (2d Cir.1920)).

However, many other courts have refused to recognize trademark ownership by a party that can only point to limited sales or sales to friends and relatives. *See, e.g., Jaffe,* 3 U.S.P.Q.2d at 1049 (granting summary judgment for defendant while finding that "token sales to personal friends and relatives ... do not constitute ... ownership of the mark" and that "[f]ederal trademark laws are not invoked by a small, isolated shipment of goods between business associates"); *Talk to Me Products,* 804 F.Supp. at 561 (granting summary judgment for defendant and quoting 3 R. Callmann, Unfair Competition, Trademarks and Monopolies, § 19.09 (4th ed.1983), which states that "a single sale, for the sole purpose of laying down the foundation for a claim of use, cannot be seriously considered").

The Third Circuit held in *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1397 (3d Cir.1985), that "because awarding ownership of a mark gives the relevant company a monopoly over the use of that mark in the prescribed area, the party asserting ownership must make a showing of 'clear entitlement.' " (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978)). The court went on to set out a four-factor test for determining whether a party has established trademark rights in a specific geographic area. These four factors are: (1) volume of sales; (2) growth trends; (3) the number of persons purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising. *Id.* at 1398–99. The court found no trademark rights were established by the "de minimis" sales, which the court defined to be less than $5,000 and less than 50 customers for any specific region.

While LIM seeks to prove ownership of the LUCENT mark on a national scale, the geographical test set out in *Natural Footwear* at least offers a guideline for determining whether LIM's one sale was adequate to establish rights in the mark. Factors (1) through (3) each work against LIM. LIM made one sale for $323.50 in 1995, no more until 1996, and there are many potential customers for document management services. LIM's sales volume (factor 1) was low, the growth trend (factor 2) was nonexistent, and the relative amount of sales (factor 3) was also very low. As noted above, advertising and promotion was not extensive, and so factor 4 also does not weigh in favor of LIM.

In *Zazu,* 979 F.2d 499, the Seventh Circuit was faced with a fact pattern similar to the one before this court. Plaintiff ZHD applied for registration of the mark ZAZU for hair products after defendant L'Oreal had itself applied. L'Oreal applied for the mark after running a trademark search, in which ZHD's name came up, and after calling ZHD and being told that ZHD was not selling any ZAZU products. Before L'Oreal's application, however, ZHD ordered a large amount of shampoo bottles, and made a few sales. The Seventh Circuit reversed a finding by the district court that defendant L'Oreal was liable for trademark infringement and declared that "[a] few bottles sold over the counter in Hinsdale [Illinois], and a few more mailed to friends in Texas and Florida, neither link the ZAZU mark with ZHD's product in the minds of consumers nor put other producers on notice." *Id.* at 503.

Thus, the court concludes that even if LIM could show that the sale of one modem to Israel Bonds Office can be credited to LIM, no reasonable trier of fact could conclude that this sale constituted prior use.

## C. *Did LTI Adopt the LUCENT Mark in Bad Faith?*

LIM claims that LTI intentionally adopted the LUCENT mark and engaged in an extensive advertising campaign, despite being aware of LIM's prior adoption of the mark. The Third Circuit has found that the relative intent inquiry in cases of reverse confusion involves determining whether defendant "was careless in not conducting a thorough name search for American uses of the name." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 480 (3d Cir.1994) (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983)). In *Fisons*, the court suggested considering such questions as the adequacy of the name search, the follow-through on the investigation, and the evaluation of likelihood of confusion.

In the present case, LTI specifically hired a firm to do a trademark search. The Thompson & Thompson report did list LIM. However, this was a two-line reference in a report several hundreds of pages long. LTI used experienced trademark counsel in determining that it could register the mark. Furthermore, LTI went to the trouble of settling with LSI Systems in California, in order to avoid infringing LSI's trademark rights, and in order to obtain the internet site LUCENT.COM. These are not the actions of a party proceeding in bad faith.

More importantly, the court has already concluded that LIM had not established trademark rights in the mark prior to LTI's registration. Therefore, LTI was entitled to register or use the mark at the time that it did, and thus did not proceed in bad faith.

## D. *LIM's Motion for Summary Judgment*

LIM has moved for summary judgment that its claims I through V are not barred by LTI's first three affirmative defenses. Since the court will grant summary judgment on Counts I through V against LIM, it does not need to consider LIM's motion.

## III. CONCLUSION

For the reasons stated above, the court will grant summary judgment in favor of defendant LTI and against plaintiff LIM on Counts I through V of plaintiff's complaint. The court will also deny plaintiff LIM's motion for summary judgment that its claims are not barred by LTI's affirmative defenses.

The court will enter an order in accordance with this memorandum opinion.